**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| NEC NETWORKS, LLC, d/b/a CAPTURERX, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | No. _ 5:19-cv-50 _____ |
| CVS HEALTH CORPORATION, CVS PHARMACY, INC., CAREMARK PHC, L.L.C., CAREMARK RX, L.L.C., WELLPARTNER LLC, and WELLPARTNER, INC., | § § § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, NEC Networks, LLC, d/b/a CaptureRx ("CaptureRx"), files this Original Complaint, complaining of the wrongful conduct of Defendants CVS Health Corporation ("CVS Health") and its wholly-owned subsidiaries and/or affiliates, CVS Pharmacy, Inc. ("CVS Pharmacy") Caremark PHC, L.L.C., Caremark Rx, L.L.C., (Caremark PHC, L.L.C. and Caremark Rx, L.L.C. shall be collectively referred to as "Caremark"); Wellpartner, LLC; and Wellpartner, Inc. (Wellpartner, LLC and Wellpartner, Inc. shall be collectively referred to as "Wellpartner"). The term "CVS" shall refer to CVS Health, CVS Pharmacy, Caremark, and/or Wellpartner. Plaintiff seeks treble damages, injunctive relief, and the cost of suit, including attorneys' fees.

## NATURE OF THE ACTION

*"The short version of what happened to CVS in 2018 is this: The company got too greedy, and then it got caught."*

— Linette Lopez, Business Insider, Mar. 30, 2018[1]

1. Founded in San Antonio, Texas, in 2000, CaptureRx is a health care technology and services company, and a leading provider of software and services to hospitals, community health clinics, and other health care providers that participate in the federal 340B Drug Pricing Program ("340B Program"). CaptureRx and its competitors, including Wellpartner, shall be referred to herein as "340B Administrators" and/or providers of "340B Administrator Services."

2. The 340B Program permits certain health care facilities to purchase outpatient prescription drugs from a manufacturer or wholesaler at significant discounts. Covered Entities (as defined below) use the savings from their discounted drug purchases to stretch their resources as far as possible and in a manner that best suits their patients' health care needs.

3. Known worldwide as one of the two largest pharmacy chains in the United States and the largest specialty pharmacy in the United States, CVS is an industry behemoth that has consolidated power in the pharmacy, pharmacy benefits management ("PBM") and 340B Administrator Services industries.

4. The illegal actions at issue in this complaint are: (a) CVS's illegal tie of its Retail Contract Pharmacy (as defined below) services to the purchase of 340B Administrator Services from Wellpartner and (b) CVS's illegal tie of its Specialty Contract Pharmacy services (as defined below) to the purchase of 340B Administrator Services from Wellpartner. These

---

[1] *See* https://www.businessinsider.com/cvs-squeezing-us-mom-and-pop-pharmacies-out-of-business-2018-3 (last accessed August 19, 2018).

actions violate Section 1 of the Sherman Act, 15 U.S.C. §1.  These actions have injured the business and property of CaptureRx and other 340B Administrators, which have lost customers who were illegally forced to deal with Wellpartner for their 340B Administrator Services.  CVS's illegal ties are foreclosing competition in the 340B Administrator market and will confer market power on CVS in that market.  The result will be supra-competitive prices and a decrease in quality of service to the Covered Entities.  Ultimately, CVS's actions threaten the health and wellbeing of the underserved patients who are the intended beneficiaries of the 340B Program.

5.    CaptureRx is but one of the many 340B Administrators that have been injured and will continue to be injured if this conduct by CVS continues.  CaptureRx has already suffered significant losses as a result of CVS's illegal conduct.

## THE PARTIES

6.    NEC Networks, LLC, d.b.a. CaptureRx, is a Texas limited liability company with its principle place of business in San Antonio, Texas.

7.    CVS Health Corporation is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island.

8.    CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS Pharmacy, Inc. is a direct wholly-owned subsidiary of CVS Health.

9.    Caremark PHC, L.L.C., is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island.  Caremark PHC, L.L.C. is a wholly-owned subsidiary of CVS Health.

10. Caremark Rx, L.L.C., is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island.  Caremark Rx, L.L.C. is a wholly-owned subsidiary of CVS Health.

11. Wellpartner, LLC is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island.  Wellpartner, LLC is a wholly-owned subsidiary of CVS Health.

12. Wellpartner, Inc. is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island.  Wellpartner, Inc. is a wholly-owned subsidiary of CVS Health.

13. Although CVS acquired Wellpartner in late 2017, Wellpartner continues to operate as a legally separate and distinct entity.

## STANDING, JURISDICTION, AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to Section 4 of the Clayton Act (15 U.S.C. § 16), Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, §§ 1331.

15. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to CaptureRx's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, CaptureRx has its headquarters and primary place of business in this District, and one or more of the Defendants reside, are licensed to do business in, transact business in, had agents in, or are found or transact business in this District.

16. The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

17. Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to CaptureRx.  Defendants engaged in illegal tying, which unreasonably restrained trade and adversely affected the 340B Administrator Services market.

18. Plaintiff has Constitutional standing to file the present action.

## GENERAL ALLEGATIONS

### I. The 340B Program

19. Named for section 340B of the Veterans Health Care Act of 1992, the 340B  Program is codified in the Public Health Service Act, 42 U.S.C. § 256B ("the Act").

20. The 340B Program requires all pharmaceutical or drug manufacturers that participate in the Medicaid program to provide discounts on certain outpatient drugs to 15 different types of health care providers that may qualify under the 340B Program, including hospitals that serve a disproportionate share of low-income patients, children's hospitals, rural referral centers, federally qualified health-care centers, Ryan White treatment centers, hemophilia treatment centers, free-standing cancer hospitals, and sole-community hospitals.  These providers are referred to herein as "Covered Entities" and are the customers of 340B Administrators.  Approximately 8,000 Covered Entities participate in the 340B Program.

21. The diagram below depicts how the 340B Program works.



*See* http://www.let340b.org/ (last accessed November 5, 2018).

### A. 340B Program Requirements

22. Congress's intent in enacting the 340B Program was to allow Covered Entities to generate savings on drug purchases to "enable these entities to stretch scarce Federal resources as far as possible reaching more Eligible Patients [defined below] and providing more comprehensive services." H.R. REP. No. 102-384, pt. 2 at 12 (1992). The Act does not dictate how Covered Entities allocate or spend the savings resulting from participating in the 340B Program. Indeed, a Covered Entity may deploy these savings in the manner it determines best allows it to address its patients' unique needs.

23. To participate in the 340B Program, Covered Entities must register with the Health Resources and Services Administration's ("HRSA") Office of Pharmacy Affairs, the federal agency responsible for administering the 340B Program. Covered Entities must recertify their 340B Program eligibility with HRSA annually.

24. Once a Covered Entity is approved to participate in the 340B Program, it may purchase outpatient drugs through the 340B Program from drug manufacturers or their wholesalers

at or below the 340B ceiling price, which is determined by a formula set out in the Act. The ceiling price is often well below the drug's average wholesale price and in many cases can be up to 50-percent lower.  In short, purchasing drugs through the 340B Program saves Covered Entities significant amounts of money.   In 2017, Covered Entities reportedly purchased over $19.3 billion of discounted drugs through the 340B Program, with savings from the 340B Program purchases estimated to be in excess of $10 billion during that year. *See* https://www.drugchannels.net/2018/05/exclusive-340b-program-reached-193.html (last accessed December 27, 2018).

### B. Eligible Patients

25.   The Act permits a Covered Entity to dispense drugs that it has purchased at the discounted 340B Program price only to the Covered Entity's Eligible Patients.  The definition of an "Eligible Patient" is set out in sub-regulatory guidance issued by HRSA at 61 Fed. Reg. 55156 (October 24, 1996).   Under this definition, an individual is considered an Eligible Patient of a Covered Entity only if all of the following apply:

   a.   The Covered Entity has established a relationship with the individual such that it maintains records of the individual's care.

   b.   The individual receives care from a professional who is either employed by or provides care under contractual or other arrangements such that responsibility for the care remains with the Covered Entity.

   c.   The individual receives care from the Covered Entity that is consistent with the services for which the Covered Entity receives federal grant funding (hospital Covered Entities are exempt from this last requirement).

26.   Dispensing drugs purchased at the 340B Program discount to individuals who do not meet the Eligible Patient definition is considered "diversion" and is a violation of the Act.  A Covered Entity that engages in diversion may be removed from the 340B Program by

HRSA, and may be required to repay the manufacturer for any improperly obtained discounts.

27. Covered Entities that operate their own pharmacies may dispense drugs purchased under the 340B Program directly to their own Eligible Patients.  Since 2010, a Covered Entity without a pharmacy, or a Covered Entity that wants to expand dispensing services over a greater geographic area or longer service hours than its own pharmacy serves, may contract with an independent pharmacy or pharmacies, referred to as "Contract Pharmacies." Covered Entities must have a written contract with and register all Contract Pharmacies with HRSA.

28. If the Covered Entity's own pharmacy dispenses the 340B drugs to its Eligible Patients, then the Covered Entity's pharmacy bills for and receives the negotiated contract price for the drug from third-party payers—such as commercial insurance companies, Medicare, and/or Medicaid—plus any patient pay amount.  The difference between the 340B ceiling price paid for the drugs and the third-party reimbursement or patient pay amounts is the "savings" generated for the Covered Entity.

29. The flow of funds and drugs through Covered Entities and their Contract Pharmacies under the 340B Program is complex, primarily because the Act requires the Covered Entity to purchase and maintain title to all drugs purchased at the 340B discount.  To comply with this requirement, Contract Pharmacies and Covered Entities generally use a "drop ship" delivery method where the manufacturer and/or wholesaler bills the Covered Entity for the 340B drugs, but ships them directly to the Contract Pharmacy.  The Contract Pharmacy then maintains these 340B drugs in a "virtual inventory" for the Covered Entity, and uses them to replace drugs from the Contract Pharmacy's own inventory that the Contract

Pharmacy dispenses to the Covered Entity's Eligible Patients.  This is commonly referred to as a drug replacement or replenishment.

30.   When a Contract Pharmacy dispenses the Covered Entity's 340B drugs to Eligible Patients, the Contract Pharmacy typically bills and collects any third-party payer or patient reimbursement for the 340B drugs dispensed, and then forwards that reimbursement to the Covered Entity, minus any applicable dispensing or administrative fees charged by the Contract Pharmacy.  The difference between the amount forwarded to the Covered Entity by the Contract Pharmacy and the 340B price paid by the Covered Entity is the "savings" captured by the Covered Entity.  The Covered Entity's "net revenues" from the 340B Program are equal to the savings minus any fees paid to 340B Administrators.

31.   HRSA guidance prohibits a Covered Entity from steering patients to or requiring use of any particular pharmacy.  Stated plainly, Covered Entities are required to ensure patients have choice regarding where their prescriptions are filled.  For example, a Covered Entity may not require a patient to fill his or her prescription at Walmart, which may be 10 miles from her home, if the patient wants to go to the CVS that is three blocks from her home.

### C.  2010 Changes to the 340B Program

32.   Prior to 2010, a Covered Entity was limited to dispensing drugs purchased at 340B discount prices to Eligible Patients either: (a) through its own in-house pharmacies or (b) through one outside Contract Pharmacy.  Thus, no Covered Entity could utilize more than one Contract Pharmacy to dispense 340B discount drugs. When Eligible Patients filled prescriptions at any pharmacy other than the Covered Entity's in-house pharmacy or the single-Contract Pharmacy, the Covered Entity realized no savings through the 340B Program, because drugs purchased by the Covered Entity at the 340B discount could not be used to fill these Eligible Patients' prescriptions.

33.   This restriction on the number of Contract Pharmacies per Covered Entity hampered full implementation of the 340B Program.  From the Eligible Patient's perspective, a Covered Entity's in-house pharmacy may be an inconvenient option for filling prescriptions because, among other reasons, of location, limited hours, or the in-house pharmacy's ability to dispense the full range of 340B covered drugs.

34.   From the Covered Entity's perspective, the inability to contract with multiple Contract Pharmacies meant that the Covered Entity was unable to dispense 340B discounted drugs to all or substantially all of its Eligible Patients, thus limiting the Covered Entity's ability to take full advantage of the savings available through the 340B Program.

35.   For these reasons, in March 2010, HRSA lifted the restriction on the number of Contract Pharmacies with which a Covered Entity could contract.  Between 2010 and 2017, the number of Contract Pharmacies grew from approximately 1,300 to nearly 21,000.  This change tremendously enhanced Eligible Patient and Covered Entity choice, which thereby increased competition among Contract Pharmacies and 340B Administrators.

36.   By engaging with multiple Contract Pharmacies, a Covered Entity is able to provide greater convenience to its Eligible Patients through increased pharmacy locations and hours, and to dispense 340B discounted drugs to more of its Eligible Patient population. Thus, increasing the number of Contract Pharmacies allows Covered Entities to provide dispensing services to more Eligible Patients, thereby maximizing the savings realized through the 340B Program.

37.   When HRSA lifted the one-Contract Pharmacy limitation in 2010, it imposed specific requirements on the relationship between the Covered Entity and its Contract Pharmacy(ies).  As stated above, the Covered Entity must register all of its Contract

Pharmacies with HRSA before a Contract Pharmacy may receive and dispense any 340B drugs purchased by the Covered Entity.  A Covered Entity must have in place a written contract with the Contract Pharmacy that meets the requirements set out in HRSA guidance.

38.   Under HRSA guidance, the Covered Entity is responsible for ensuring that each Contract Pharmacy with which it engages complies with the Act and all HRSA guidance.  Written Contract Pharmacy agreements must cover the parties' performance obligations, audit requirements, reports and inventory management requirements, and protection of patient choice.  This agreement must also recite the parties' obligations to adhere to all applicable federal and state laws, including the Act.

39.   Each Contract Pharmacy agreement must also provide for a system of drug tracking and patient eligibility verification to prevent the diversion of drugs purchased by the Covered Entity at the 340B discount to individuals who are not the Covered Entity's Eligible Patients.  Diversion is strictly prohibited under the Act, and offending Covered Entities may be removed from the 340B Program and required to repay drug manufacturers for improperly obtained discounts.

40.   HRSA guidance also provides that unless a Covered Entity has made specific arrangements to prevent duplicate discounting with a state's Medicaid agency, a Contract Pharmacy may not dispense 340B discounted drugs to Medicaid beneficiaries.  A duplicate discount, which is prohibited under the Act, occurs when a drug manufacturer pays a state Medicaid agency a rebate under the Medicaid Drug Rebate Program on a drug the manufacturer sold to the Covered Entity at the (already) discounted 340B price.

41.    In order to satisfy HRSA guidance, a Contract Pharmacy agreement must require Covered Entities to periodically compare their prescribing records with the Contract Pharmacy's dispensing records, and to retain independent auditors to perform annual audits to detect irregularities such as diversion or duplicate discounts.  HRSA itself also audits Covered Entities and Contract Pharmacy arrangements to ensure compliance with 340B Program requirements.

42.    To facilitate the implementation, operation, and compliance with respect to their participation in the highly complex 340B Program, Covered Entities often contract with 340B Administrators.

43.    340B Administrators, such as CaptureRx and Wellpartner, provide Covered Entities with a variety of essential services, including identifying and verifying Eligible Patients and prescriptions and tracking and managing 340B drug purchasing, dispensing, inventory and replacement through the use of specialized software designed to prevent diversion and duplicate discounts.  340B Administrators also convert Covered Entity 340B drug data into usable workflow and payment records that Covered Entities use to conduct audits required or recommended by HRSA.

**II.  Contract Pharmacies**

44.    Approximately 21,000 pharmacy locations currently participate as Contract Pharmacies in the 340B Program. Likewise, there are approximately 8,000 Covered Entities with well over 50,000 Contract Pharmacy relationships.

45.    A Contract Pharmacy relationship involves substantial implementation and administrative costs, as well as financial and compliance risks to the Covered Entity.  For example, if a Covered Entity is not able to replenish the Contract Pharmacy using drugs purchased at the 340B discount, the Covered Entity may be required to reimburse the Contract Pharmacy for

the dispensed drug at the full price paid by the Contract Pharmacy.  (This can happen if the Contract Pharmacy does not dispense enough of a given drug to the Covered Entity's Eligible Patients to satisfy the minimum unit of order from the manufacturer and/or wholesaler.) This situation will result in a loss of 340B savings to the Covered Entity.

46. There are two types of Contract Pharmacies: retail ("Retail Contract Pharmacies") and specialty ("Specialty Contract Pharmacies").   Retail Contract Pharmacies are the neighborhood pharmacies, such as CVS, that contract with Covered Entities.   Retail Contract Pharmacies offer a wide range of standard pharmacy services, including dispensing of brand name and generic drugs, such as antibiotics; a limited number of specialty drugs; and a range of other products and services, including, without limitation, some or all of the following: walk-in clinics, over the counter medications, food, health and beauty products, photo finishing, seasonal merchandise, greeting cards, flu shots, prescription counseling, audiology and optical services.

47. Specialty Contract Pharmacies offer a wide range of contract pharmacy services that focus on the dispensing of specialty drugs.  Specialty drugs are low-volume and high-cost drugs for patients undergoing intensive therapies for illnesses that are generally chronic, complex and potentially life-threatening, such as cancer, rheumatoid arthritis and Hepatitis C. Specialty drugs typically have special storage, temperature and handling requirements, are given by infusion, injection or taken orally, need to be taken on a strict schedule and cost more than regular drugs and often require close monitoring or support.

48. All or nearly all Covered Entities must contract separately with both Specialty Contract Pharmacies and Retail Contract Pharmacies.  For example, in 2017, Wellpartner informed Covered Entities that "the recent and anticipated growth of specialty pharmacy *necessitates*

adding specialty pharmacy to your existing pharmacy services" (emphasis added). Wellpartner stated that specialty drug spending "had doubled in the last five years, contributing to 70% of overall medicine spending growth between 2010 and 2015." Wellpartner observed that specialty drug spending had reached $121 billion in 2015, up more than 15 percent from 2014, and projected specialty drug spending to reach over $400 billion by 2020 and $1.7 trillion by 2030. Covered Entities "lack product access" and "payer contracts" to develop their own specialty drug program. So Covered Entities must rely on Specialty Contract Pharmacies—including the market leader, CVS—for access to specialty drugs in their 340B operations.

49.     Because Covered Entities are not permitted to steer patients to particular pharmacies, Covered Entities seek to contract with the Retail Contract Pharmacies and Specialty Contract Pharmacy pharmacies where their Eligible Patients are most likely to fill prescriptions, so that the Covered Entities may capture as much of the available 340B Program savings as possible. But not every pharmacy is a suitable Retail Contract Pharmacy or Specialty Contract Pharmacy.

50.     In order to address the types of financial and compliance risks described above—and to maximize the 340B savings associated with Contract Pharmacies and minimize administrative expenses—Covered Entities contract with only those Retail and Specialty pharmacies that are best positioned to fill large volumes of prescriptions for their Eligible Patients and do not present substantial financial compliance risks. Typically, a Covered Entity will contract only with a pharmacy that fills 300 to 400 of that Covered Entity's eligible prescriptions each month.

51. Covered Entities seek to contract with those Retail Contract Pharmacies located in close proximity to their Eligible Patients. According to the Government Accountability Office, in 2017, half of Covered Entities had all of their Contract Pharmacies within 30 miles of the Covered Entity, but these distances varied by Covered Entity type. *See* Government Accountability Office Report to Congressional Requesters, Drug Discount Program Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement (June 2018) ("GAO                         Report")                  at                  23 https://www.gao.gov/assets/700/692697.pdf (last accessed December 27, 2018).

52. On the retail end, a Covered Entity chooses the Retail Contract Pharmacies with the most convenient locations, good brand recognition, loyalty programs, national footprint, massive national databases of prescription information, a wide range of products and services, the highest Eligible Patient volumes, and greatest access to 340B covered drugs. Contracting with these pharmacies permits the Covered Entity to realize the greatest 340B Program savings and minimize the transactional costs and financial and compliance risks.

53. Many small and independent pharmacies typically do not compete in the Retail Contract Pharmacy market. That is because larger chain pharmacies are typically more desirable for Covered Entities to work with, as they are much easier to identify than smaller independent pharmacies, typically have streamlined approval and implementation processes, multiple convenient locations, brand recognition, loyalty programs, national footprint, massive national databases of prescription information and a wide range of products and services offered. In general, it is much more efficient for Covered Entities to negotiate a contract with one chain pharmacy that has numerous locations near its patients than it is for the Covered Entity to identify and negotiate with separate, independent pharmacies.

Furthermore, contracting with a large number of small and independent retail pharmacies increases the transactional costs and compliance risks.

54. According to the Government Accountability Office, as of July 2017, chain pharmacies comprised slightly over half of the total retail pharmacy locations in the United States, but accounted for no fewer than 75 percent of the Retail Contract Pharmacy locations. Combined, the five biggest pharmacy chains—CVS, Walgreens, Walmart, Rite-Aid, and Kroger—represented 60 percent of Retail Contract Pharmacies, but only 35 percent of all pharmacies nationwide.  GAO Report at 20–21.

55. Similarly, a 2017 Pembroke Consulting report states that six retail pharmacy chains—Walgreens, CVS, Walmart, Rite Aid, Kroger, and Albertsons—account for two out of three Contract Pharmacy locations.

56. On the specialty end, a Covered Entity chooses the specialty pharmacies throughout the United States with the greatest access to 340B-covered specialty drugs and ability to safely handle, process and fulfill specialty drug prescriptions on a national basis.  Manufacturers and/or wholesalers limit distribution of certain specialty drugs to a limited number of specialty pharmacy locations.  Furthermore, cost, volume, monitoring and/or special handling considerations for many specialty drugs make it economical to have only a limited number of specialty pharmacy locations.

57. Unsurprisingly, national and regional chain pharmacies dominate the market for 340B Specialty Contract Pharmacies because they tend to serve the highest number of Eligible Patients and have the best access to 340B Program drugs and best ability to handle, monitor, and process such drugs.

16

### III.  CVS

58.  CVS is a $185 billion entity that dominates the Retail Contract Pharmacy and Specialty Contract Pharmacy markets.  CVS's suite of integrated assets (in the areas of retail pharmacy, specialty pharmacy, and pharmacy benefits management ("PBM") gives CVS sustainable competitive advantages over other providers of Retail Contract Pharmacy and Specialty Contract Pharmacy services, none of which matches CVS's market presence in any of the three pillars of CVS's dominance.

59.  CVS boasts in its public statements to Wall Street that "We own the last mile of care through our unmatched patient touchpoints," including retail and specialty pharmacy. *See* http://investors.cvshealth.com/~/media/Files/C/CVS-IR-v3/documents/12-15-2016/2016-analyst-day-helena-foulkes-presentation.pdf (last accessed December 13, 2018).  Larry Merlo, CVS's Chief Executive, also boasts that through its "unmatched patient touchpoints," CVS "owns the 'front door' of our customers' health care experience." *See* http://investors.cvshealth.com/~/media/Files/C/CVS-IR-v3/reports/annual-report-2017.pdf (last accessed December 13, 2018).

60.  In its 2018 Securities and Exchange Commission Form 10-K annual report ("10-K"), CVS stated that as of December 31, 2017, it "held approximately 23.6 percent of the United States retail pharmacy market."  CVS operates the most retail pharmacy locations in the United States (over 9,800) and generates the highest prescription revenues of any other retail pharmacy.



See http://investors.cvshealth.com/~/media/Files/C/CVS-IR-v3/reports/cvs-ar-2017.pdf. (last accessed Nov. 12, 2018).

61. Of note, 70 percent of the United States' population lives within three miles of a CVS, and 82 percent lives within ten miles. In its 2015 10-K, CVS stated that it operated in "98 of the top 100 United States drugstore markets" and held "the number one or number two market share in 88 of these markets."  In its most recent 10-K, CVS reported that it operated in "all of the top 100 United States drugstore markets."

62. CVS proudly declares itself to be "America's leading retail pharmacy with nearly 9,800 locations nationwide."  *See* https://cvshealth.com/about/our-offerings/cvs-pharmacy (last accessed August 17, 2018).  CVS promotes its massive size and firm grip on the retail pharmacy market:



*See* https://cvshealth.com/about/facts-and-company-information (last accessed August 17, 2018).

63.   Adjusting the list of the top 15 retail pharmacies—the target for 340B Covered Entities—to exclude the captive insurers' pharmacies (where 340B Program participation is minimal), CVS's dominance is even more pronounced: CVS controls 51.1 percent of this adjusted top 15 market nationwide. In a distant second place, Walgreens represents just 29.6 percent of this adjusted top 15 market.

64.   CVS's 2017 10-K predicted that its partnerships with PBMs and plans will increase its growth by at least 6 percent.  *See* http://investors.cvshealth.com/~/media/Files/C/CVS-IR-v3/reports/annual-report-2017.pdf (last accessed December 13, 2018).

65.   CVS's large retail footprint (including its recently added locations in Target stores), brand recognition, loyalty program, massive databases of patient information (which CVS promotes in its 2017 10-K as "the industry's leading patient care platform"), relationships

with PBMs and payers, wide range of products and services offers and its leading role as a PBM make CVS essential to third-party payers (including those beyond Aetna), who contract with CVS to provide services for managing drug formularies, medical benefits, and site of care management, and often appoint CVS as their exclusive or preferred supplier of some or all drugs. These factors in turn require many Covered Entities to contract with CVS in order to obtain access to the CVS retail pharmacies that serve the covered lives of those payers.  All of these factors make CVS a "must have" Retail Contract Pharmacy for a substantial number of Covered Entities.

66. Similarly, on the specialty end, CVS's status as the exclusive or preferred supplier of some or all drugs to many payers, as described above, and its unmatched access to specialty drugs, all make CVS is a "must have" Specialty Contract Pharmacy for a substantial number of Covered Entities.  According to CVS, it offers Covered Entities unrivaled access to specialty drugs—in particular 99 percent of all specialty drugs therapies are available through CVS.   *See*   https://www.cvsspecialty.com/wps/portal/specialty/healthcare-professionals/about-us/!ut/p/a1/hc_LDoIwEAXQb3HBll61weKuPvCBikaN2I0Bg4UEKAGU3xeMGxIfs7uTc5MZIohLROo9IumVkUq9uMnCuLDtatx1KGx2MDg4dSxOjQFwNGpwrgG-DMe__omINsFq0pBR396sLYD23sCcMyzoDLaz4wzcdOgU1MSedd_gxw1LImSs_Nc_Z576fSaJyINbkAe5fs_rdViWWTHUoKGqKl0qJeNAv6pEw6dKqIqSuG1JssRFtE1OrOCdJ5TjcnU!/dl5/d5/L2dBISEvZ0FBIS9nQSEh/ (last accessed December 28, 2018).

67. CVS proclaimed itself in its most recent 10-K as the "industry's largest specialty pharmacy by a considerable margin"  *See also*  https://www.drugchannels.net/2018/03/the-top-15-specialty-pharmacies-of-2017.html (last accessed December 13, 2018) (CVS dominates the

overall specialty pharmacy market and ranks number one in terms of specialty drug prescription revenues).

68.     CVS's dominance of the Specialty Contract Pharmacy market is even greater.  CaptureRx estimates, upon information and belief, that CVS's share of prescription revenues to be 60 percent, based on the volume of specialty drugs sold through the 340B Program.  In 2016, the next largest dispenser of specialty drugs in the 340B Program behind CVS was Walgreens, with 10 percent, followed by Kroger and Walmart, with just 1 percent each.

69.     Another pillar of CVS's market dominance in the markets for Specialty Contract Pharmacy and Retail Contract Pharmacy services is its PBM business, conducted through CVS Caremark.  Health plans provide insurance to consumers and contract with PBMs to negotiate rebates with pharmaceutical manufacturers and/or wholesalers and to assemble networks of retail and specialty pharmacies to service the covered lives of those health plans.  CVS Caremark is the largest PBM in the United States, with nearly 94 million plan members.          *See*          http://drugchannelsinstitute.com/files/PBMI-PBM_Outlook-Drug_Channels-Fein-Mar2018-Handouts.pdf   (last accessed December 13, 2018).   CVS can and does steer these patients insured by health plans serviced by its PBM to its retail and specialty pharmacies.  In 2014, CVS stated publicly that nearly 60 percent of specialty pharmaceutical prescriptions managed by the CVS Caremark PBM were dispensed through CVS or its affiliated companies.  This dominance is demonstrated by more than 1,000 exclusive or preferred arrangements that CVS has with third-party payers. These preferred arrangements often take the form of disincentives, or penalties, for the use of non-CVS specialty pharmacies.  CVS's exclusive and preferred arrangements with third-party payers create a substantial barrier to entry for competing specialty pharmacies seeking to compete

in the Specialty Contract Pharmacy market. These exclusive and preferred arrangements with third-party payers also enhance CVS's status as a "must have" Specialty Contract Pharmacy for Covered Entities.

70.   Nationwide, CVS is the exclusive supplier of specialty drugs for approximately 35 million Americans covered by various health insurance plans, bolstering CVS's status as a "must have" Specialty Contract Pharmacy nationwide.

71.   When discussing its specialty pharmaceutical business publicly, CVS differentiates between "patient directed" and "payer directed" business. According to CVS, its "enterprise assets"—including retail pharmacy—"make CVS/specialty the pharmacy of choice when patients have options." CVS identifies Hepatitis C drugs as one example where its "national market share" is substantially greater than that of its "nearest competitor" in the "patient directed" segment of the Specialty Contract Pharmacy market.

72.   CVS's $69 billion merger with Aetna has now combined CVS with the third-largest health insurer in the United States, with over 23 million covered lives, and would further cement CVS as a must have Retail Contract Pharmacy and Specialty Contract Pharmacy with Covered Entities.

73.   Aetna has an approximately 19-percent share of the market for small-group (1–100 employees) benefit plans in Delaware, an approximately 18-percent share of the market for small-group benefit plans in Arizona, an approximately 17-percent share of the market for small-group benefit plans in New Jersey, an approximately 15-percent share of the market for small-group benefit plans in Virginia, an approximately 14-percent share of the market for small-group benefit plans in Alaska, and an approximately 12-percent share of the market for small-group benefit plans in West Virginia. Aetna also has an approximately 37-

percent share of the market for large-group (over 100 employees) benefit plans in the District of Columbia, an approximately 17-percent share of the market for large-group plans in New Jersey, an approximately 15-percent share of the market for large-group plans in Delaware, an approximately 12-percent percent share of the market for large-group benefit plans in Alaska, an approximately 12-percent share of the market for large-group plans in Utah, and an approximately 11-percent share of the market for large-group plans in Texas. Aetna is also is the first- or second-largest health insurer in more than 40 metropolitan areas in the United States.

74.   Because insurers can and do steer Covered Entities' Eligible Patients toward specific pharmacies, including Contract Pharmacies, now that the Aetna merger is completed, it is even more clear that Covered Entities would almost certainly need to include CVS Specialty Contract Pharmacies and Retail Contract Pharmacies in their Contract Pharmacy networks.

**IV.   340B Administrators, Including CaptureRx**

75.   Covered Entities remain responsible for ensuring that the Contract Pharmacies they engage comply with the 340B statutory and regulatory regime, including HRSA guidance. Navigating this regime is an extremely complicated and data-driven undertaking.  The information required to track and monitor eligible dispensing and to prevent diversion and duplicate discounts often resides in different databases within a Covered Entity, so manually attempting to gather and reconcile this information can prove very costly and can significantly increase the risk of 340B Program non-compliance.

76.   For most Covered Entities that utilize Contract Pharmacies, the solutions offered by 340B Administrators are essential, particularly for ensuring compliance.  Among other things,

these solutions enable Covered Entities to monitor eligibility, inventory reconciliation and replenishment, invoicing, and auditing.

77.   Additionally, 340B Administrators help Covered Entities to identify Contract Pharmacies to include in the Covered Entities' networks; negotiate dispensing agreements, including fee structures; and manage Contract Pharmacy relationships.  For these services, many 340B Administrators charge Covered Entities a fee through various models, typically on a fixed fee per prescription, with some 340B Administrators also charging additional fees based on a percentage of total prescription savings or savings generated.

78.   CaptureRx is a leading and innovative 340B Administrator. Since 2000, CaptureRx has provided accountability, transparency, and value-based solutions for participants in the 340B Program, including hospitals and community health centers.  CaptureRx is well known for providing outstanding 340B Program integrity, compliance, and personalized customer service.

79.   CaptureRx has served more than 500 hospitals and health centers and through those Covered Entities, more than 3,500 Retail Contract Pharmacies and Specialty Contract Pharmacies.  With its unique solutions and services, CaptureRx helped those Covered Entities to realize millions of dollars in 340B Program savings on more than 750 million claims.

80.   Each of CaptureRx's solutions is provided under multi-year contracts.  Many of these contracts are exclusive in terms of the combination of Covered Entity and Contract Pharmacy.

81. CaptureRx devotes substantial resources and investment—including time, effort, business intelligence, and expense—to prospecting, identifying, and developing Covered Entities interested in participating in the 340B Program.

**V.  Wellpartner**

82. Wellpartner is a competitor of CaptureRx.  Until the end of 2017, Wellpartner was an independent 340B Administrator.

83. Since around 2002, Wellpartner has operated with a fairly small market share, and has been disfavored by many Covered Entities because it charges fees significantly above the industry.

84. Notably, in a post in the "thought leadership" section of its website's resource center, Wellpartner described the state of the 340B Program industry:

> In 2017, pharmacy chains will support administration through all the major TPAs [340B Administrators], providing an opportunity for Covered Entities to consolidate vendors, thereby simplifying their oversight process. This will allow Covered Entities to gain greater control and reduce risks related to both eligibility determination and 340B inventory reconciliation.
>
> No longer will Covered Entities have to select a TPA [340B Administrator] based on exclusive access to a particular pharmacy chain. Since all the major pharmacy chains are now available through a standardized process and fee schedule, what was once a primary TPA [340B Administrator] selection criterion (pharmacy access) is now moot. Covered Entities can focus on narrowing down their 340B administrative relationships and evaluate which solution offers the best transparency and oversight for 340B Program compliance.

A copy of the Wellpartner post, *Third Party Administration, Opportunities for Covered Entities to Improve Oversight*, is available at https://www.wellpartner.com/thought-leadership/third-party-administration-opportunities-for-covered-entities-to-improve-oversight/ (last accessed December 13, 2018).

25

## VI.  **CVS's Anticompetitive Conduct**

85.  On December 18, 2017, CVS publicly announced its acquisition of Wellpartner to serve as "the exclusive 340B Program administrator for all CVS retail and specialty pharmacies." A copy of one version of the announcement is attached as Exhibit 1.

86.  What's more, CVS announced it intended to "transition all Covered Entities [who contracted with CVS] to Wellpartner by December 31, 2018."  A copy of a version of the announcement containing the mandatory transition deadline is attached as Exhibit 2.

87.  In other words, CVS was expressly forcing Covered Entities to select a 340B Administrator based on exclusive access to a particular pharmacy chain, *i.e.*, CVS.

88.  CVS's mandate that Covered Entities use Wellpartner as their 340B Program Administrator to gain access to CVS as a Retail or Specialty Contract Pharmacy has no business justification.  Instead, like its major competitors, CVS previously permitted covered entities to work with several different 340B Administrators.

89.  On December 18, 2017—the very same day that CVS announced its acquisition of Wellpartner—Wellpartner salespeople began emailing many of the Covered Entities with whom CaptureRx had agreements.

90.  These salespeople confirmed that the Covered Entities must use Wellpartner as their exclusive 340B Administrator in order to contract with CVS as a Specialty Contract Pharmacy or a Retail Contract Pharmacy, and that if the Covered Entities already had CVS as a Specialty Contract Pharmacy or a Retail Contract Pharmacy within their 340B network, the failure to switch quickly to Wellpartner would result in the cancellation of all their pharmacy contracts with CVS.

91.  To effectuate the switch, Wellpartner provided CaptureRx's Covered Entity customers with mandatory and non-negotiable pharmacy contract amendments that stated Wellpartner "will be <u>solely</u> responsible for ensuring 340B Program compliance."

92.  Wellpartner salespeople also informed one or more of CaptureRx's Covered Entity customers that they would need to use Wellpartner exclusively for *all or nearly all* Contract Pharmacies in the 340B network if they wanted to continue to have access to CVS Contract Pharmacies.

93.  In other words, Wellpartner confirmed that it is far from a mere component in what CVS and Wellpartner have marketed as their "integrated 340B solution." Instead, Wellpartner remains CVS's wholly owned 340B Administrator—deployed to poach Covered Entities, including CaptureRx's customers, not only for CVS's Retail Contract Pharmacy and Specialty Contract Pharmacy business, but for all those Covered Entities' business with other Contract Pharmacies.

94.  Covered Entities also generally desire to limit the number of 340B Administrators to reduce transactional costs and to limit the risk of errors and inconsistencies.  Thus, even if CVS had not expressly mandated that Covered Entities use Wellpartner exclusively for all or nearly all Contract Pharmacies in the 340B network if they wanted access to CVS Contract Pharmacies, the impact of CVS's actions would be the same—that Covered Entities would be forced to use Wellpartner exclusively for CVS and non-CVS Contract Pharmacies.

95.  Covered Entities, including CaptureRx's Covered Entity customers must now decide whether to use Wellpartner as their sole 340B Administrator, to the exclusion of CaptureRx

and other providers of 340B Administrator, or lose CVS's participation in their 340B networks.

**VII.**   **Impact of CVS's Anticompetitive Conduct**

96.   Many of CaptureRx's customers have expressed that they see no choice but to use Wellpartner as their sole 340B Administrator to be able to include CVS in their 340B Program.   Examples of customer communications received by CaptureRx about CVS's forcing them to use Wellpartner include the following:



June 20, 2018

Ean Swinton
CaptureRx

Ean,
This letter represents a formal request to move my CVS contract pharmacy from CaptureRx to Wellpartner beginning October 1, 2018.  This request has nothing to do with the service ▇▇▇▇▇ ▇▇▇▇▇ has received from CaptureRx.  CVS informed us that we had to move to Wellpartner as the TPA for their pharmacies.  I look forward to our continued partnership with our other contract pharmacies.

Sincerely,



97.   It has been reported that Wellpartner's above-market fees will negatively impact Covered Entities' 340B Program net revenues, and that the Covered Entity has grave concerns about Wellpartner's service levels.

98.   Because of its history of providing outstanding 340B Program integrity, compliance, and personalized customer service, Covered Entities have expressed a desire to retain CaptureRx. Many—if not most—of CaptureRx's covered-entity customers chose it as their 340B Administrator after an extensive vetting processes. After years of CaptureRx providing them with critical and valuable data at a single point of access, along with maintaining compliance, they have developed a very high comfort level with CaptureRx. Absent CVS's mandate, CaptureRx's Covered Entity customers would not even consider using Wellpartner and would have no reason to do so.

99.  CaptureRx has lost and is threatened with the loss of a substantial volume of business, as a result of CVS's unlawful ties.  At least 40 Covered Entity customers have terminated their agreements with CaptureRx, and other Covered Entity customers have indicated that they will not renew their contracts with CaptureRx.  As CVS continues to pressure customers with its mandates, CaptureRx suspects that most of its Covered Entity customers will cease doing business with CaptureRx.  But for CVS's unlawful ties, these customers would have remained with CaptureRx.

100.  CVS's illegal tie has similarly impacted other providers of 340B Administrator services, including Sentry Data Systems, Inc. and RX Strategies, Inc.

101.  In addition to the impact on CaptureRx, other 340B Administrators and Covered Entities, CVS's anticompetitive practices have harmed the public.  The 340B Program was established to provide Covered Entities with savings to allow them to provide expanded care and services to the community and patients they serve.  Because Covered Entities will suffer a decrease in net revenues from the 340B Program by using Wellpartner (because of Wellpartner's higher fee structure and other practices that have the impact of decreasing the level of savings), less funding will be available for Covered Entities for the provision of services to the patients who were the intended beneficiaries of the 340B Program.

## COUNT ONE: ILLEGAL TYING IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT, 15 U.S.C. §1

102.  Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 101.

103.  Defendants' anticompetitive conduct, described above, violates the Sherman Antitrust Act.  As discussed herein, Defendants' actions constitute two separate illegal tying arrangements in violation of the Sherman Act.

I.     **The Tying Products: Retail Contract Pharmacies and Specialty Contract Pharmacies**

104.   There are two separate tying products at issue: Retail Contract Pharmacies and Specialty Contract Pharmacies.

105.   Retail Contract Pharmacies and Specialty Contract Pharmacies are separate tying products because Covered Entities separately contract with Retail Contract Pharmacies and Specialty Contract Pharmacies.

   A. *Retail Contract Pharmacies*

106.   Covered Entities contract with Retail Contract Pharmacies because many Eligible Patients may fill their prescriptions at pharmacies that are unaffiliated with Covered Entities, and because Eligible Patients may have better access to Retail Contract Pharmacies than to Covered Entities' pharmacies.  By contracting with a Retail Contract Pharmacy, a Covered Entity may better serve a greater number of Eligible Patients.

107.   Retail Contract Pharmacies compete based on their dispensing fees and other terms of dealing, location and national footprint, access to 340B Program discounted drugs, brand recognition, loyalty programs, prescription volume, massive national databases of prescription information, and range of products and services offered, among other factors.

108.   Not all pharmacies, particularly many independent pharmacies or small chains, can effectively compete in the market for Retail Contract Pharmacies because Covered Entities desire to contract with retail pharmacies that will be frequented by the vast majority of their Eligible Patients.  Most Eligible Patients are far more likely to have their prescriptions filled at a CVS or another large chain than at independent or small chain pharmacies. Accordingly, Covered Entities generally do not contract with all independent or small chain pharmacies because of the transactional costs, and financial and compliance risks of contracting with such smaller entities do not outweigh the expected additional incremental

generation of 340B Programs savings/revenues.  Furthermore, many independent and small chain pharmacies are not likely to dispense enough of a given drug to the Covered Entity's Eligible Patients to satisfy the minimum unit of order from the manufacturers and/or wholesalers and therefore would not be viable Retail Contract Pharmacies.   The participants in the market for Retail Contract Pharmacies are as set forth in the current HRSA Database.

109.   The market for the Retail Contract Pharmacies is protected by barriers to entry of new competitors.  Such barriers include the time and cost of obtaining the network of physical locations that serve the needs of Covered Entities, established PBM and payer relationships, brand recognition, loyalty program, high prescription volume for 340B Program drugs, national footprint, massive databases of prescription information and a wide range of products and services.  There are no close substitutes for Retail Contract Pharmacies.

**B. *Specialty Contract Pharmacies***

110.   Covered Entities contract with Specialty Contract Pharmacies to capture savings from Eligible Patients' prescriptions for the high level specialty drugs that are available only at specialty pharmacies.  Drug manufacturers and/or wholesalers limit the distribution of many specialty drugs to specialty pharmacies. Furthermore, only specialty pharmacies dispense many specialty drugs because of cost, volume, monitoring and/or special handling considerations.

111.   Specialty drugs represent approximately 50 percent of total prescription drug revenues and a similarly high percentage of total revenues from the 340B Program.  Therefore, Covered Entities cannot afford not to contract with Specialty Contract Pharmacies.

112. Specialty Contract Pharmacies compete based on a number of factors, including the following:

- Dispensing fees and other terms of dealing.

- Availability of a full or nearly full line of specialty drugs and specialty pharmacy services, which are critical to the 340B Program.

- Specialized personnel and facilities for handling and supporting specialty drugs that can be extremely expensive and fragile.

- National distribution infrastructure.

113. Retail pharmacies cannot compete with Specialty Contract Pharmacies because they lack the facilities, expertise, support capabilities, infrastructure and access to a full line or nearly full line of specialty drugs and/or payer contracts that Specialty Contract Pharmacies possess.  The participants in the market for Specialty Contract Pharmacies are as set forth in the current HRSA Database.

114. The market for Specialty Contract Pharmacies is protected by multiple barriers to entry by new competitors, including the following:

- The ability to purchase limited distribution specialty drugs from manufacturers and/or wholesalers and thus offer a full or nearly full line of specialty drugs.

- The time and costs of obtaining certification, licensing, infrastructure and personnel for processing and handling of specialty drugs.

- Established relationships with PBMs, payers and other purchasers of specialty drugs.

## II.  The Tied Product: 340B Administrator Services

115. The tied product consists of providers 340B Administrator Services (also referred to as 340B Administrators).  340B Administrators compete based on total fees, quality of customer service, ability to accurately screen out claims to prevent diversion and duplicate discount claims, and the ability to maximize the net 340B Program revenues for Covered Entities (*i.e.*, 340B Program savings minus fees charges by providers of 340B

Administrator Services).   340B Administrators require specialized, custom-designed software and technology solutions to administer 340B Programs.

116. Barriers to entry to the market for 340B Administrator Services include the time and cost of product and database design and maintenance, data infrastructure, and developing an established network of customers and—now—Defendants' anticompetitive conduct.

## III.   The Tying Products and the Tied Product Are Separate Products

117. Retail Contact Pharmacies and Specialty Contract Pharmacies (collectively, the "Tying Products") are separate products from 340B Administrators.  Covered Entities historically have purchased these services from different providers, the products are offered, priced and charged separately, and Covered Entities demand these products separately.  Covered Entities utilize 340B Administrators separately from Specialty Contract Pharmacies and Retail Contact Pharmacies because doing so is more transparent and efficient, in part because of the resulting number and diversity of competitors.

118. Retaining 340B Administrators that are separate from Contract Pharmacies benefits Covered Entities because such 340B Administrators provide truly independent adjudication services.  For example, because 340B Administrators that are separate from Contract Pharmacies do not derive any Contract Pharmacy dispensing fees, they do not have the incentive to process a claim that might provide negative revenue to a Covered Entity or approve claims that would not be eligible, such as fee for service Medicaid claims.

## IV.   The Relevant Geographic Markets

### A.   *Relevant Geographic Markets: Retail Contract Pharmacies*

119. The geographic markets for Retail Contract Pharmacies are limited to the local geographic areas encompassing the Retail Contract Pharmacies that contract with the Covered Entities that are the subject of CVS's unlawful tying arrangements.  These geographic markets are

local because Covered Entities draw their Eligible Patients from the local markets surrounding their physical locations, and seek to contract with Retail Contract Pharmacies located in the same geography as their Eligible Patient population.  Because the law prohibits Covered Entities from steering patients to any particular pharmacy, the sizes of the relevant geographic markets are limited by the area in which Covered Entities' Eligible Patients seek pharmacy services.

120.  Covered Entities generally draw a substantial majority of their patient population from within catchment radii of approximately 30 miles, and therefore need Retail Contract Pharmacies located near Eligible Patients' homes and places of work.  Though, in theory, Covered Entities may contract with any retail pharmacy in the United States, they rarely, if at all, contract with retail pharmacies outside of the geographic area in which the vast majority of their Eligible Patients live and work.  This is because contracting with Retail Contract Pharmacies outside of these geographic areas would not be worth the additional transactional costs or increased financial and compliance risks.

121.  Core-based statistical areas ("CBSAs") reasonably approximate the geographic bounds of local geographic markets for Retail Contract Pharmacies.  A CBSA is a geographic area defined by the U.S. Office of Management and Budget, consisting of one or more counties (or equivalents) anchored by an urban center of at least 10,000 people plus adjacent counties that are socioeconomically tied to the urban center by commuting.  This same methodology is relevant to the same patient flow issues in healthcare markets.  Consumers generally seek health care near their home.  Because Covered Entities generally draw patients from local markets, which access health care close to where they work and live, and because Covered Entities contract with Retail Contract Pharmacies that serve their

patient populations, the local geographic markets relevant to this action are reasonably and plausibly approximated by the CBSAs in which Covered Entities are located.

### B.  *Relevant Geographic Markets: Specialty Contract Pharmacies*

122.  The geographic market for Specialty Contract Pharmacies, on the other hand, is nationwide.  Covered Entities in any particular location tend to contract with Specialty Contract Pharmacies located throughout the United States.  This is because the distribution of many specialty drugs is limited by the manufacturers and/or wholesales to a limited number of locations.  Moreover, the cost, volume, monitoring and/or special handling considerations for certain specialty drugs make it economical to have only a limited number of sales outlets throughout the United States.  Covered Entities therefore must contract with Specialty Contract Pharmacies all over the United States.  For example, certain Covered Entities located in Massachusetts contract with Specialty Contract Pharmacies located not only in Massachusetts, but also in Illinois, Florida, Kansas, New Jersey, North Carolina, Tennessee, Michigan, and, upon information and belief, in New York, Pennsylvania and elsewhere.  Additionally, according to Pembroke Consulting, as of July 2018 the typical CVS Specialty location had agreements with 214 Covered Entities located around the country.

### C.  *Relevant Geographic Markets: 340B Administrator Services*

123.  The relevant geographic market for 340B Administrators Services is nationwide. CaptureRx, Sentry, Wellpartner and other 340B Administrators currently compete for the business of Covered Entities all over the United States.  Because 340B Administrators work primarily with electronic data and execute electronic transactions, they do not need to be located close to their Covered Entity customers.

## V. CVS's Unlawful Tying Arrangements

124. Shortly after its acquisition of Wellpartner, CVS demanded that Covered Entities must purchase 340B Administrator Services from Wellpartner in order to contract with CVS's Retail Contract Pharmacies or Specialty Contract Pharmacies.  Thus, CVS has conditioned its sale of both Retail Contract Pharmacy and Specialty Contract Pharmacy services upon the purchase of its 340B Administrator Services from Wellpartner.  This mandate has forced or will effectively force Covered Entities to purchase 340B Administrator Services from CVS—not because Covered Entities prefer to do so, but only because they must obtain access to CVS for its Retail Contract Pharmacies or Specialty Contract Pharmacies.

125. Covered Entity customers of CaptureRx have also reported that CVS's mandate is even more far reaching because CVS is also stating to some or all Covered Entities that as a condition of obtaining access to CVS for its Retail Contract Pharmacies and Specialty Contract Pharmacies, Covered Entities must use Wellpartner not only for their CVS Retail Contract Pharmacies and CVS Specialty Contract Pharmacies, but also for their non-CVS Retail Contract Pharmacy and non-CVS Specialty Contract Pharmacies.

126. Numerous Covered Entities have ended their relationships with CaptureRx and/or have indicated the intent to do so following the expiration of their contracts with CaptureRx. These Covered Entities have stated that they preferred to remain with CaptureRx, but were forced (or will be forced) to do business with Wellpartner in order to have access to CVS's Tying Products, which they must have in their networks.

127. Using Wellpartner will cost some or all Covered Entities much more than using CaptureRx because of Wellpartner's higher total administrator fees and because Wellpartner's services will lower the Covered Entities' realized 340B Program net revenues.

128. CVS's mandate that Covered Entities that desire to contract with CVS for Retail Contract Pharmacy services must also purchase 340B Administrator Services from Wellpartner constitutes a *per se* unlawful tying arrangement.

129. CVS's mandate that Covered Entities that desire to contract with CVS for Specialty Contract Pharmacy services must also purchase 340B Administrator Services from Wellpartner constitutes a *per se* unlawful tying arrangement.

130. CVS's mandate that Covered Entities that desire to contract with CVS for Retail Contract Pharmacy services must also purchase 340B Administrator Services from Wellpartner is also unlawful under the rule of reason.

131. CVS's mandate that Covered Entities that desire to contract with CVS for Specialty Contract Pharmacy services must also purchase 340B Administrator Services from Wellpartner is also unlawful under the rule of reason.

## VI. CVS Possesses Substantial Market Power

### A. *CVS's Substantial Market Power in the Local Geographic Markets for Retail Contract Pharmacy Services*

132. CVS has substantial market power in the local geographic markets for Retail Contract Pharmacy services. CVS's substantial market power in local geographic markets for Retail Contract Pharmacy services is demonstrated in several ways. First, based on recently reported HRSA data, CVS has a share of over 30 percent of the Retail Contract Pharmacy locations in the CBSAs of Covered Entities listed in Table 1 below.

**Table 1.**

| CBSA # | Description | Share of Locations |
|--------|-------------|--------------------|
| **20700** | East Stroudsburg, PA | 76.9% |
| **15680** | California-Lexington Park, MD | 75.0% |

| CBSA # | Description | Share of Locations |
|--------|-------------|-------------------:|
| 30140 | Lebanon, PA | 73.5% |
| 47780 | Washington, IN | 66.7% |
| 29540 | Lancaster, PA | 61.0% |
| 49620 | York-Hanover, PA | 55.6% |
| 25420 | Harrisburg-Carlisle, PA | 50.0% |
| 19540 | Decatur, IN | 50.0% |
| 15220 | Brownwood, TX | 50.0% |
| 31340 | Lynchburg, VA | 45.7% |
| 14100 | Bloomsburg-Berwick, PA | 45.5% |
| 24700 | Greensburg, IN | 45.2% |
| 45460 | Terre Haute, IN | 42.9% |
| 42200 | Santa Maria-Santa Barbara, CA | 42.9% |
| 19260 | Danville, VA | 41.4% |
| 14460 | Boston-Cambridge-Newton, MA-NH | 38.8% |
| 49020 | Winchester, VA-WV | 38.5% |
| 10900 | Allentown-Bethlehem-Easton, PA-NJ | 36.7% |
| 49180 | Winston-Salem, NC | 35.2% |
| 42540 | Scranton--Wilkes-Barre, PA | 34.4% |
| 33140 | Michigan City-La Porte, IN | 33.9% |
| 45220 | Tallahassee, FL | 33.3% |
| 14220 | Bogalusa, LA | 33.3% |
| 44860 | Sulphur Springs, TX | 33.3% |
| 46780 | Van Wert, OH | 33.3% |

| CBSA # | Description | Share of Locations |
|---|---|---|
| 26460 | Hudson, NY | 33.3% |
| 19820 | Detroit-Warren-Dearborn, MI | 33.0% |
| 44140 | Springfield, MA | 31.6% |
| 18020 | Columbus, IN | 30.4% |
| 18260 | Cookeville, TN | 30.0% |
| 37080 | Oxford, NC | 30.0% |

*See* https://340bopais.hrsa.gov/ (last accessed December 13, 2018).

133. Second, based on recently reported HRSA data, CVS has a share of over 30 percent of the Retail Contract Pharmacy contracts in the CBSAs of Covered Entities listed in Table 2, below.

**Table 2.**

| CBSA # | Geographic Market | Share of Contracts |
|---|---|---|
| 20700 | East Stroudsburg, PA | 76.9% |
| 15680 | California-Lexington Park, MD | 75.0% |
| 30140 | Lebanon, PA | 73.5% |
| 47780 | Washington, IN | 66.7% |
| 45220 | Tallahassee, FL | 56.6% |
| 49620 | York-Hanover, PA | 55.6% |
| 29540 | Lancaster, PA | 54.3% |
| 19540 | Decatur, IN | 50.0% |
| 15220 | Brownwood, TX | 50.0% |
| 31340 | Lynchburg, VA | 46.9% |

| CBSA # | Geographic Market | Share of Contracts |
|--------|-------------------|-------------------:|
| **24700** | Greensburg, IN | 45.5% |
| **14100** | Bloomsburg-Berwick, PA | 45.5% |
| **49020** | Winchester, VA-WV | 45.5% |
| **25420** | Harrisburg-Carlisle, PA | 41.7% |
| **19260** | Danville, VA | 41.4% |
| **13780** | Binghamton, NY | 38.4% |
| **42200** | Santa Maria-Santa Barbara, CA | 38.2% |
| **45460** | Terre Haute, IN | 37.5% |
| **39740** | Reading, PA | 35.1% |
| **34620** | Muncie, IN | 35.0% |
| **19820** | Detroit-Warren-Dearborn, MI | 33.9% |
| **14220** | Bogalusa, LA | 33.3% |
| **42020** | San Luis Obispo-Paso Robles, CA | 33.3% |
| **44860** | Sulphur Springs, TX | 33.3% |
| **46780** | Van Wert, OH | 33.3% |
| **49180** | Winston-Salem, NC | 33.3% |
| **26460** | Hudson, NY | 33.3% |
| **38860** | Portland-South Portland, ME | 33.2% |
| **10900** | Allentown-Bethlehem-Easton, PA-NJ | 31.4% |
| **44140** | Springfield, MA | 30.8% |
| **42540** | Scranton--Wilkes-Barre, PA | 30.6% |
| **18020** | Columbus, IN | 30.4% |
| **13340** | Bellefontaine, OH | 30.0% |

| CBSA # | Geographic Market | Share of Contracts |
|--------|-------------------|-------------------:|
| **18260** | Cookeville, TN | 30.0% |

*See* https://340bopais.hrsa.gov/ (last accessed December 13, 2018).

134. These market share figures are likely understated because of CVS's recent lifting of its one-to-one policy (which previously restricted access to each of its retail pharmacy locations to a single Covered Entity). Consequently, historical data concerning CVS's level of participation in the Retail Contract Pharmacy market likely understate CVS's market share subsequent to its lifting of this restriction, and the resulting increase in the number of contracts. Therefore, there are likely to be more CBSAs in which CVS has or will have a share of over 30 percent of the Retail Contract Pharmacy contracts.

135. Finally, CVS's substantial market power in each of the local geographic markets for Retail Contract Pharmacies in which CVS competes is also demonstrated by virtue of the unique economic circumstances in these markets. In particular, Covered Entities have the economic incentive to enter into contracts with a network of Retail Contract Pharmacies in their markets that will yield the optimal return of 340B Program net revenues, without presenting unreasonable financial and compliance risks. CVS is a "must have" Retail Contract Pharmacy, due to its brand recognition, loyalty programs, prescription volume, national footprint, massive national databases of prescription information, and wide range of products and services offered, among other factors. In addition, CVS is a "must have" in any geographic market in which it is located because of its ability to steer to CVS Retail Contract Pharmacies those Eligible Patients who are covered by Aetna or other payers who utilize the Caremark PBM services.

136. Because CVS is a "must have" Retail Contract Pharmacy, if Covered Entities do not include one or more CVS Retail Contract Pharmacy locations in their network, they would forego substantial savings from those Eligible Patients that have their prescriptions filled at CVS Retail Contract Pharmacies.  Thus, even if CVS represents less than 30 percent of the number of locations or contracts in any CBSA, CVS nonetheless possesses substantial economic power in the CBSAs where it competes because of these unique economic circumstances.

B. **CVS's Substantial Market Power in the National Geographic Market for Specialty Contract Pharmacy Services**

137. CVS has substantial market power in the national geographic market for Specialty Contract Pharmacy services.  First, based on recently reported HRSA data, CVS's national share of Specialty Contract Pharmacy locations is 33.33 percent.  Second, based on recently reported HRSA data, CVS's national share of Specialty Contract Pharmacy contracts is 47.17 percent.  *See* https://340bopais.hrsa.gov/ (last accessed December 13, 2018).

138. Furthermore, CVS enjoys market power due to the unique economic circumstances in the market.  Covered Entities have the economic incentive to enter into contracts with a network of Specialty Contract Pharmacies that will yield the optimal return of 340B Program revenues.  CVS is a "must have" Specialty Contract Pharmacy, due to its brand recognition loyalty program, and ability to offer a full line or nearly full line of specialty drugs and specialty pharmacy services.  In fact, CVS boasts that it offers "one of the broadest offerings of specialty pharmaceuticals in the industry."  *See* https://www.cvsspecialty.com/wps/wcm/connect/d5405d7b-685e-4377-b998-2e4c4daf0b13/SpecialtyDrugs.pdf?MOD=AJPERES&CACHEID= (last accessed December 28, 2018).  In addition, CVS has ability to steer to CVS Specialty Contract

43

Pharmacies those Eligible Patients who are covered by Aetna or other payers who utilize the Caremark PBM services.

139. Because CVS is a "must have" Specialty Contract Pharmacy, if Covered Entities do not include one or more CVS Specialty Pharmacies in their network, they would forego substantial savings from those Eligible Patients who have their specialty drug prescriptions filled at these CVS Specialty Pharmacies.

## VII.   Anticompetitive Impact of CVS's Illegal Ties

140. There has been a substantial amount of sales impacted by CVS's illegal tying arrangements.  As a result of CVS's illegal ties, at least 40 of CaptureRx's customers have terminated or provided notice of intent to terminate their 340B Administrator relationships. These are valued at $3 million dollars annually.  Furthermore, as CVS continues efforts to enforce its unlawful ties, CaptureRx expects substantially more terminations.  Sentry Data Systems, Inc.; RX Strategies, Inc.; and other 340B Administrators have been similarly impacted by CVS's illegal tying arrangements.

141. Competition for 340B Administrator Services will be adversely impacted because CVS's illegal tying arrangements as set forth above will have the effect of substantially foreclosing CaptureRx and other 340B Administrators from the market and result in Wellpartner obtaining market power in the tied product market for 340B Administrator Services.

142. Unless CVS's illegal tying arrangements are enjoined, by continuing to foreclose competing 340B Administrators from the market, CVS will obtain market power and have the ability to force Covered Entities to pay supracompetitive 340B administration fees and/or realize lower 340B Program net revenues, and have the ability to decrease the quality and breadth of its services.

## JURY TRIAL DEMAND

143.  CaptureRx demands a jury trial on all issues so triable.

## PRAYER

WHEREFORE, CaptureRx requests judgment as follows:

a.  That the Court declare, adjudge and decree that Defendants have committed the violations of Section 1 of the Sherman Act alleged herein;

b.  That Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities be enjoined and restrained permanently from tying the provision of Retail Contract Pharmacy services to the purchase or sale of 340B Administrator services as described herein.

c.  That Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities be enjoined and restrained permanently from tying the provision of Specialty Contract Pharmacy services to the purchase or sale of 340B Administrator services as described herein.

d.  That the Court award damages sustained by CaptureRx on the First Count in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act, 15 USC § 15.

e.  That the Court award to CaptureRx the cost of suit, including reasonable attorneys' fees.

f.  That the Court award CaptureRx all further relief the Court finds just and proper.

Respectfully submitted,

DYKEMA GOSSETT PLLC
112 East Pecan Street, Suite 1800
San Antonio, TX  78205
(210) 554-5500 - Telephone
(210) 226-8395 - Telecopier


By: */s/ C. David Kinder*
C. David Kinder
State Bar No. 11432550
William (Butch) Hulse
State Bar No. 24010118
Ryan J. Sullivan
State Bar No. 24102548
whulse@dykema.com
dkinder@dykema.com
rsullivan@dykema.com

and

Howard B. Iwrey
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI  48305
(248) 203-0526 – Telephone
(855) 232-1791 – Telecopier
hiwrey@dykema.com