# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NEC NETWORKS, LLC D/B/A | § | |
| CAPTURERX, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 5:19-CV-00050-OLG |
| CVS HEALTH CORPORATION, CVS | § | |
| PHARMACY, INC., CAREMARK PHC, | § | |
| L.L.C., CAREMARK RX, L.L.C. | § | |
| WELLPARTNER LLC, AND | § | |
| WELLPARTNER, INC., | § | |
| Defendants. | | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6) AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. ....................................................................................... ii

INTRODUCTION. ..................................................................................................... 1

BACKGROUND. ........................................................................................................ 2

ARGUMENT. ............................................................................................................. 4

I.      CAPTURERX SUFFICIENTLY PLEADS A PER SE ILLEGAL TYING
CLAIM ................................................................................................................ 4

    A.  CaptureRx Sufficiently Alleges Direct Evidence of Anticompetitive
Effects Obviating the Need for Detailed Market Definition and
Analysis of Market Power ............................................................................. 6

    B.  CaptureRx Sufficiently Alleges a Relevant Product and Geographic
Market, in Which CVS Has Market Power, In the Market for RCP
Service ......................................................................................................... 8

        1.    CaptureRx may prove its tying claim by defining relevant
markets and alleging that CVS has market power ............................... 8

        2.    CaptureRx sufficiently alleges relevant geographic markets for
RCPs ...................................................................................................... 9

        3.    CaptureRx alleges CVS's market power in the RCP market ............... 12

    C.     CaptureRx Sufficiently Alleges a Relevant Product and
Geographic Market, in Which CVS has Market Power, In The
Market for SCP Services ............................................................................. 15

        1.    CaptureRx sufficiently alleges relevant SCP product market ............ 15

        2.    CaptureRx sufficiently alleges a relevant geographic market for
SCPs ..................................................................................................... 16

        3.    CaptureRx sufficiently alleges CVS's market power in the SCP
market ................................................................................................... 17

    D.     CaptureRx Sufficiently Pleads Injury ................................................... 19

CONCLUSION ........................................................................................................... 20

CERTIFICATE OF SERVICE ..................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Allergy & Asthma*
   *Network/Mothers of Asthmatics*,
   Case No. 5-14-cv-35, 2017 U.S. Dist. LEXIS 222623 (W.D. Tex. Sept. 29,
   2017) (Garcia, J.) ............................................................................................................11

*Apani Southwest, Inc. v. Coca-Cola Enters.*,
   300 F.3d 620 (5th Cir. 2002) ..........................................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................................4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................4

*Bob Maxfield Inc. v. Am. Motors Corp.*,
   637 F.2d 1033 (5th Cir. 1981) ..........................................................................................5

*Bodet v. Charter Comms., Inc.*,
   Case No. 09-3068, 2010 U.S. Dist. LEXIS 87088 (E.D. La. 2010) .........................................12

*Breaux Bros. Farms v. Teche Sugar Co.*,
   21 F.3d 83 (5th Cir. 1994) .........................................................................................6, 12

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962).........................................................................................8, 10, 11, 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)........................................................................................................19

*C.E. Services, Inc. v. Control Data Corp.*,
   759 F.2d 1241 (5th Cir. 1985) ..........................................................................................8

*Constr. Cost Data, LLC v. Gordian Grp., Inc*,
   Case No. H-16-114, 2017 U.S. Dist. LEXIS 77481 (S.D. Tex. April 24, 2017)...................7, 8

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
   123 F.3d 301 (5th Cir. 1997) ..........................................................................................19

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 US 451 (1992)........................................................................................................5, 6

*FTC v. Indiana Fed'n of Dentists*,
   476 US 447 (1986)............................................................................................................6

*Federal Trade Comm'n v. Staples, Inc.*,
   190 F.Supp.3d 100 (D.D.C. 2016) ........................................................16

*Hernandez v. ARC Trading Co.*,
   Case No. 3:17-CV-2057-BN, 2018 U.S. Dist. LEXIS 73480 (N.D. Tex. May
   1, 2018) ..............................................................................................18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ...........................................................1, 4, 5, 7, 13, 17, 18

*Kaufman v. Time Warner*, ,
   *836 F.3d 137 (2d Cir. 2016)* ................................................................14

*Nat'l Ath. Trainers' Ass'n v. Am. Physical Therapy Ass'n*,
   Case No. 3:08-cv-158, 2008 U.S. Dist. LEXIS 70131 (N.D. Tex. Sept. 9,
   2008) ...................................................................................................17

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ................................................................8

*Northern Pac. R. Co. v. United States*,
   356 U.S. 1 (1958) ..........................................................................4, 14

*R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf) Inc.*,
   807 F.2d 1222 (5th Cir. 1987) ................................................................8

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
   635 F.3d 757 (5th Cir. 2011) ................................................................4

*Republic  Tobacco Co., v. N. Atl. Trading Co.*,
   *381 F.3d 717 (7th Cir. 2004)* ................................................................8

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*,
   786 F. Supp. 2d 1190 (S.D. Tex. 2009) ..................................................6

*RX Strategies, Inc. v. CVS Pharmacy, Inc.*,
   Case No. 8:18-cv-1087, ECF No. 82 (M.D. Fla. May 29, 2019)............................20

*Seidenstein v. Nat'l Medical Enterprises, Inc.*,
   769 F.2d 1100 (5th Cir. 1985) ................................................................8

*Sentry Data Sys., Inc. v. CVS Health*,
   Case No. 18-cv-60257, 2019 U.S. Dist. LEXIS 57279 (S.D. Fla. April 3,
   2019) (attached hereto as Exhibit 1) ..................................................2, 11, 13, 20

*Sidibe v. Sutter Health*,
   4 F. Supp. 3d 1160 (N.D. Cal. 2013) ......................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................4

*Todd v. Exxon Corp.*, ,
    275 F. 3d 191 (2d Cir. 2001).................................................................................13

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...............................................................................12

*United States v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974).............................................................................................11

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)......................................................................................15, 16

*United States v. Visa USA, Inc.*,
    163 S. Supp 2d 322 (S.D.N.Y 2001)......................................................................7

*Universal Hosp. Servs. v. Hill-Rom Holdings, Inc.*,
    Case No. SA-15-CA-32-FB, 2015 U.S. Dist. LEXIS 154154 (W.D. Tex.
    2015) ....................................................................................................................10

**Statutes**

SHERMAN ACT SECTION 1, 15 U.S.C. § 1 .............................................................2, 4, 5

**Rules**

FED. R. CIV. P. 8(a)(2)..............................................................................................19

FED. R. CIV. P. 9(b) ..................................................................................................19

FED. R. CIV. P. 12(b)(6) ..............................................................................................4

## INTRODUCTION

CVS is leveraging its market power in the separate Retail Contract Pharmacy ("RCP") and Specialty Contract Pharmacy ("SCP") markets to illegitimately force Covered Entities ("CEs") to purchase 340B Administrator Services from CVS's subsidiary, Wellpartner. Defendants admit that these products are tied together "on an integrated basis," yet they portray themselves as white knights, riding in to save the day with unsupported claims of efficiencies created by the tie. Defs Mot. at 1-2. Even if this Court could ignore the Complaint's well-pleaded factual allegations to the contrary, Defendants rely on a fundamental misunderstanding of the economic reality underlying the harm they are causing to Plaintiff NEC Networks, LLC d/b/a CaptureRx ("CaptureRx"), to competition, to CEs, and to other intended beneficiaries of the 340B Program.

Defendants incorrectly present the issue as a choice, suggesting: "[i]f there remains choice in the pharmacy market, covered entities can decide whether they are better off with the CVS integrated model or with the separate products offered by Plaintiff." *Id.* This is inapplicable here. The Complaint contains detailed factual allegations that CEs are stripped of that choice by Defendants' admitted tie. CEs can no longer use CaptureRx's 340B Administrator Services if they use CVS' Contract Pharmacies. The allegations also make clear that, in any of the alleged relevant markets, the only choice left for CEs is whether to have access to potential 340B savings through the eligible patients ("EPs") under the 340B Program who choose CVS's Contract Pharmacy, or to forego all of the resulting potential savings/revenue. But this "choice" is no choice at all with Defendants' power in the RCP and SCP markets. Defendants' conduct is exactly the type of unlawful "forcing" that the Supreme Court cautioned against in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("the essential

1

characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated").

Defendants move to dismiss the Complaint, arguing that CaptureRx does not define the relevant markets, establish that CVS has sufficient market power in those markets, or allege injury.  These arguments rely on misstatements of law and fact, and a number of them were recently rejected by the Southern District of Florida in a tying claim against Defendants by Sentry Data Systems, Inc. (another 340B Administrator) based on tying allegations similar to those presented here.  *See Sentry Data Sys., Inc. v. CVS Health* ("*Sentry II*"), Case No. 18-cv-60257, 2019 U.S. Dist. LEXIS 57279 at *13–14 (S.D. Fla. April 3, 2019) (denying motion to dismiss tying claim) (attached hereto as Exhibit 1).  As explained further below, the Court should likewise deny Defendants' Motion to Dismiss here.

## <u>BACKGROUND</u>

Plaintiff CaptureRx is a leading provider of administrative and other related services to CEs that participate in the federal 340B Program.  Compl. ¶ 1.  The 340B Program allows CEs to purchase certain drugs for EPs directly from drug manufacturers at a discounted price, allowing CEs to achieve a cost savings between the reimbursement price (*e.g.*, Medicare, Medicaid, or commercial insurance company negotiated reimbursement rate) and the discounted price, which CEs use at their discretion to help underserved populations.  Compl. ¶¶ 24–30.  Prior to 2010, a CE could participate in the 340B Program only at its own pharmacy or at a single outside pharmacy.  Compl. ¶ 32.  This restriction—which severely inhibited CEs from capturing EPs—

was lifted in 2010, allowing CEs to contract with as many Contract Pharmacies as economically warranted.  Compl. ¶¶ 32–43.  Because CEs may not steer EPs to any one pharmacy, when putting together their networks of Contract Pharmacies that will maximize savings realized under the 340B Program, CEs must include pharmacies that their EPs are most likely to patronize.  Compl. ¶¶ 31, 49.  CEs typically must contract separately with RCPs and SCPs.  Compl. ¶ 48.

CVS is a dominant player in both the RCP and SCP markets.  Compl. ¶ 58.  On the retail side, CVS has the largest number of retail pharmacy locations in the United States, possesses 23.6% of the United States retail pharmacy market (as of Dec. 31, 2017), and has over 30% of the retail market shares in at least 34 separate core-based statistical areas ("CBSAs").  Compl. ¶¶ 60–62, 133.  On the specialty side, CVS is even more dominant, with a 33.33% national share of SCP locations, a 41.17% share of SCP contracts, an approximately 60% market share for specialty prescription revenues, and more than 1,000 exclusive or preferred arrangements with third-party payers resulting in CVS serving as the exclusive supplier of specialty drugs for approximately 35 million Americans nationwide.  Compl. ¶¶ 66–70, 137.  For CEs, CVS is a "must have" in any geographic market in which CVS is located (retail) or does business (specialty).  Compl. ¶¶ 135–39.

While CVS has entrenched its dominance in the RCP and SCP markets for years, in late 2017 CVS entered the market for 340B Administration Services by acquiring Wellpartner, a separate 340B Administrator and competitor of CaptureRx. Compl. ¶¶ 13, 82.  Many CEs disfavored Wellpartner because it charges fees that are significantly greater than those charged by other 340B Administrators, Compl. ¶ 83, resulting in less 340B savings that can be used to benefit their underserve patients.  Despite the higher fees charged by Wellpartner—or perhaps because of them—CVS immediately named Wellpartner "the exclusive 340B Program

3

administrator for all CVS retail and specialty pharmacies." Compl. ¶ 85. Worse, Wellpartner informed one or more of CaptureRx's CE customers that the CE must use Wellpartner for all or nearly all Contracted Pharmacies in the 340B network to continue to have access to CVS Contract Pharmacies. Compl. ¶ 92–93. This use of CVS's market power *forces* potential and actual customers of CaptureRx to pay more money (lose captured revenue from the 340B Program) for 340B Administration Services from Wellpartner—instead of using CaptureRx or another vendor of their choice, leaching money that Congress intended to stay with CEs to benefit underserved communities. Compl. ¶¶ 96–101.

## ARGUMENT

Pursuant to Rule 12(b)(6), the Court must view the Complaint "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). A complaint need not contain "detailed factual allegations," just "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.   CAPTURERX SUFFICIENTLY PLEADS A PER SE ILLEGAL TYING CLAIM.

Defendants engaged in an unlawful *per se*[1] tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Compl. ¶¶ 102–42. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5–6 (1958). "Such an

---

[1] If not *per se* illegal, tying arrangements may still be held unlawful under the Rule of Reason. *Jefferson Parish*, 466 U.S. at 29. Defendants do not contest that the Complaint states a claim under the rule of reason. Thus, even if the Court dismisses *per se* claims, the rule of reason claims survive.

arrangement violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 US 451, 462 (1992) (citation omitted).  In *Jefferson Parish*, the Supreme Court explained unlawful tying as follows:

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer . . . might have preferred to purchase elsewhere on different terms. . . . Accordingly, we have condemned tying arrangements when the seller has some special ability — usually called "market power" — to force a purchaser to do something that he would not do in a competitive market.  When "forcing" occurs, our cases have found the tying arrangement to be unlawful. . . . Per se condemnation — condemnation without inquiry into actual market conditions — is only appropriate if the existence of forcing is probable. . . . Once this threshold is surmounted, per se prohibition is appropriate if anticompetitive forcing is likely.

466 U.S. at 12–18 (internal citations and quotations omitted) (emphasis added).

In the Fifth Circuit, some Courts have applied a four part_ test for an illegal tying arrangement: "(1) two separate products, the tying product and the tied product; (2) sufficient market power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market." *Bob Maxfield Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981). For purposes of the instant motion, Defendants do not dispute the existence of a tie of separate products, that the tie "affects a not insubstantial volume of commerce," or that there are sufficient allegations of anticompetitive effect in the 340B Program Administration market. Instead, Defendants dispute only that CaptureRx has alleged that Defendants possess sufficient power in properly defined relevant tying product markets, and that CaptureRx alleges harm.

A.   **CAPTURERX SUFFICIENTLY ALLEGES DIRECT EVIDENCE OF ANTICOMPETITIVE EFFECTS, OBVIATING THE NEED FOR DETAILED MARKET DEFINITION AND ANALYSIS OF MARKET POWER.**

Defendants' primary arguments in their motion to dismiss relate to a supposed pleading deficiency in terms of defining relevant markets and alleging sufficient market power therein. *See generally* Mot. at 5–16. However, Defendants fail to acknowledge that CaptureRx need not allege market power or market definition, because CaptureRx alleges direct evidence of anticompetitive effects.

Market power is the power "to force a purchaser to do something that he would not do in a competitive market," or the "ability of a single seller to raise price and restrict output." *Kodak*, 504 U.S. at 464 (citations omitted). "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effect, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effect.'" *FTC v. Indiana Fed'n of Dentists*, 476 US 447, 460–61 (1986) (quoting 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986)); *Kodak*, 504 U.S. at 477 ( "It is clearly reasonable to infer that [a defendant] has market power . . . [where a plaintiff] offers evidence that [the defendant] did so."). The Fifth Circuit has acknowledged that this principle applies to tying cases. *Breaux Bros. Farms v. Teche Sugar Co*., 21 F.3d 83, n 3 (5th Cir. 1994). "A plaintiff, therefore, does not need to define a market if it can support its claim with direct evidence that the defendant controlled prices or excluded the competition." *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.,* 786 F. Supp. 2d 1190 (S.D. Tex. 2009).

The Complaint alleges direct evidence that Defendants excluded competition, raised prices, and forced CEs to purchase services they would have purchased elsewhere on different terms in an otherwise competitive market. Specifically, CaptureRx alleges that its current (and

potential) customers have been forced to switch to Wellpartner's 340B Administration Services against their will, and that Wellpartner charges higher prices to those customers than they would have otherwise paid in a competitive market.  Compl ¶¶ 96–101.  This is not a conclusory allegation.  The Complaint includes specific customer emails which provide direct evidence that Defendants' anticompetitive effect has already occurred.  Compl. ¶¶ 96.  This is direct evidence that CEs choose to contract with Wellpartner, even at higher prices, to avoid losing access to EPs that choose CVS pharmacies, and it is exactly this type of forcing the Supreme Court cautioned against in *Jefferson Parish,*466 U.S. at 12.

Courts have found that similar evidence at trial constituted direct evidence of market power.  For example, in *United States v. Visa USA, Inc.*, the court found direct evidence of market power through "testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them."  163 F. Supp. 2d 322, 340 (S.D.N.Y. 2001).  Similarly here, CEs cannot refuse to contract with Defendants—even in the face of a significant price increase—because they would lose a substantial number of customers who choose to shop at CVS.  Compl ¶¶ 96–101.

Thus, because CaptureRx may state a claim without having a properly defined relevant market, the Court should not dismiss the Complaint based on tying market definition or market power.  *See Constr. Cost Data, LLC v. Gordian Grp., Inc*, Case No. H-16-114, 2017 U.S. Dist. LEXIS 77481 at *35–36 (S.D. Tex. April 24, 2017) ("assuming arguendo that Defendants' challenge to Plaintiffs' market definition had merit, dismissal at this stage would still not be appropriate since Plaintiffs may succeed on their claims under the direct evidence approach").[2]

---

[2] Defendants do not contest the relevant market definition for the tied product, which is the market where the direct evidence approach focuses.  "Some courts have held that, under the direct evidence approach, plaintiffs must still

**B.    CAPTURERX SUFFICIENTLY ALLEGES A RELEVANT PRODUCT AND GEOGRAPHIC MARKET, IN WHICH CVS HAS MARKET POWER, IN THE MARKET FOR RCP SERVICES.**

**1.    CaptureRx may prove its tying claim by defining relevant markets and alleging that CVS has market power.**

CaptureRx properly alleges a tying claim by alleging relevant markets in which CVS has market power.  Pursuant to this approach, "[b]efore a defendant's market power can be determined, the relevant market must be defined."  *Seidenstein v. Nat'l Medical Enterprises, Inc.*, 769 F.2d 1100, 1106 (5th Cir. 1985).  To identify the proper relevant market, courts look to the "area of effective competition," which is itself determined by reference to (1) the product market, as well as (2) the geographic market in which it is sold.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); *R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf) Inc.*, 807 F.2d 1222, 1224–25 (5th Cir. 1987).

Precisely because relevant market determination is so intensely fact specific, it is almost never appropriate to dismiss a complaint at the pleading stage based on market definition.  There is a "fact-specific core embedded in any determination of relevant market."  *C.E. Services, Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985).  Whether a relevant market has been identified is usually a question of fact. *Seidenstein*, 769 F.2d at 1106.  *See also Constr. Cost Data*, 2017 U.S. Dist. LEXIS 77481 at \*34 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) ("[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market"); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Thus, a plaintiff's market definition survives a motion to dismiss "unless it is apparent from the face of the complaint that the alleged market

---

describe the 'rough contours of a relevant market,' although they need not make 'the usual showing of a precisely defined relevant market.'" *Constr. Cost Data*, 2017 U.S. Dist. LEXIS 77481 at \*37 (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004)).  The Fifth Circuit has not considered this requirement, and thus has not adopted it.  To the extent that "rough contours" of the tying markets are required, the below discussion shows that the Complaint satisfies the requirement.

suffers a fatal legal defect."  *Id.* at 1045.  It is clear from the Complaint that CaptureRx sufficiently alleges the relevant markets at issue here.

### 2.    CaptureRx sufficiently alleges relevant geographic markets for RCPs.

Defendants do not contest that CaptureRx alleges a valid product market for RCP services.  For this product market, the Complaint alleges that the relevant geographic markets are all CBSAs in which CVS operates a RCP.[3]  Compl. ¶¶ 119–21.  A CBSA is a geographic area defined by the U.S. Office of Management and Budget, and which consists of one or more counties (or equivalents) anchored by an urban center of at least 10,000 people plus adjacent counties that are socioeconomically tied to the urban center by commuting.  Compl. ¶ 121.  CBSAs reasonably approximate local geographic markets for RCPs because they mirror patient flow.  Compl. ¶ 121.

Defendants argue that the Complaint does not provide notice of the number, location, or boundaries of the geographic markets alleged, and they compare the allegations in the Complaint to a case in which the only description of the geographic markets was that they were "local" in nature.  Mot. at 8–9 (citing *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013)).  Defendants claim that the Complaint does not "even suggest that the purportedly 'local' relevant market(s) at issue here can be identified or limited in any way."  Mot. at 9–10.

Defendants' attacks on the RCP geographic market allegations fail for a number of separate and independent reasons.  First, the "metes and bounds" of a geographic market are not required at this stage.  *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974).  Second, the argument relies on a blatant misreading of the factual allegations in the Complaint.  CVS obviously knows every location in which it operates an RCP that contracts with a CE.  The

---

[3] A Retail Contract Pharmacy is itself defined as "the neighborhood pharmacies, such as CVS, that contract with CEs."  Compl. ¶ 46.  Thus, the geographic market definition is limited to those CBSAs where CVS operates a retail pharmacy that contracts with a CE.

Complaint and the instant motion both reference and incorporate the publicly available websites defining the exact boundaries of the CBSAs.  Thus, Defendants have notice of the exact number, location, and boundaries of the relevant geographic markets alleged here, which is more than sufficient to state a claim.  *See, e.g., Universal Hosp. Servs. v. Hill-Rom Holdings, Inc.*, Case No. SA-15-CA-32-FB, 2015 U.S. Dist. LEXIS 154154 (W.D. Tex. 2015) (distinguishing the exact case cited by Defendants here (*Sidibe*) and denying motion to dismiss where complaint alleged geographic markets based on identifiable area surrounding defendant's physical locations).

Moreover, despite Defendants' false assertion that "[m]any courts have rejected using statistical areas as the relevant geographic market," courts routinely hold that CBSAs and similar statistical areas approximate a relevant geographic market for antitrust cases.  For example, the Supreme Court in *Brown Shoe* upheld the use of the exact same type of statistical area Plaintiff seeks to use here.  370 U.S. at 299, 338–39. In that case, the district court even acknowledged the same concern Defendants complain of here, *i.e.*, that "the areas of effective competition for retailing purposes cannot be fixed with mathematical precision."  *Id.* at 299.  The Supreme Court upheld the use of local markets for retail defined by every "city of 10,000 or more population and its immediate and contiguous surrounding area, regardless of name designation," even though the use failed to capture "some commercial intercourse" elsewhere.  *Id.* at 338–39. Though the issue here is where CEs will turn for RCP services, this issue depends largely on where EPs of the CE decide to shop at retail because CEs cannot steer customers to a particular location.  Compl. ¶¶ 31, 49.  Thus, *Brown Shoe* supports use of CBSAs here.

Numerous courts have followed *Brown Shoe* in concluding that the use of CBSAs is appropriate in geographic market definition.  In fact, this very Court recently denied a motion for summary judgment in a case where plaintiffs' expert used CBSAs to define the relevant

geographic area. *Acad. of Allergy & Asthma in Primary Care v. Allergy & Asthma Network/Mothers of Asthmatics*, Case No. 5-14-cv-35, 2017 U.S. Dist. LEXIS 222623 at *49–50 (W.D. Tex. Sept. 29, 2017) ("While [defendant] may argue against the analysis of Plaintiffs' expert regarding where consumers can practically go for services . . . this is not a case in which the plaintiff made no showing on this subject.") (Garcia, J.).

Likewise, in concurrent litigation brought by another 340B Administrator against CVS and Wellpartner challenging the same tying arrangement by Defendants at issue here, the Southern District of Florida squarely rejected the same challenge to allegations of relevant geographic markets based on CBSA and denied Defendants' motion to dismiss. *See Sentry II* at *13–14. The plaintiff in *Sentry II* based its market definition on "22 individual CBSAs." *Id.* The court, emphasizing that "geographic markets need not be defined by 'metes and bounds,'" denied CVS's motion to dismiss and held that CBSAs adequately approximate the markets for Contract Pharmacy services. *Id.* (quoting *Conn. Nat'l Bank*, 418 U.S. at 669).

The cases that Defendants cite do not support Defendants' broad assertion that courts frequently reject market definition based on statistical area. For example, although Defendants are correct that a district court ruled against the use of Standard Metropolitan Statistical Areas ("SMSAs," predecessors to CBSAs) in *Connecticut National Bank*, Defendants fail to acknowledge that this ruling was a result of every expert who testified at trial agreeing that SMSAs did not approximate the geographic market. 418 U.S. at 282. The case does not, as Defendants suggest, support a bright-line rule that statistically generated areas are legally insufficient for market definition.[4]

---

[4] *Robinson v. Magovern*, 521 F. Supp. 842, 883 (W.D. Pa. 1981), also does not support Defendants' assertion of such a bright-line rule. That case involved a highly specialized service (open heart surgery) for which people were willing to travel much farther than the area in which their local retail pharmacies were located.

Defendants' only other argument is that the CBSAs do not comport with the commercial realities.  Mot. at 10–11 (relying on *Apani Southwest, Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 633 (5th Cir. 2002)).  Defendants suggest that because CBSAs come in various sizes and shapes and driving distances vary, CBSAs do not reflect commercial realities.  Initially, this argument must fail because it asks the Court to ignore well-pleaded factual allegations to the contrary.  CaptureRx alleges that CBSAs are reasonable approximations of the area to which CEs can reasonably turn, and provides factual allegations in support.  Compl. ¶ 121.  Defendants ask the Court to ignore those allegations.  Moreover, *Apani* does not support Defendants' argument.  *Apani* involved an alleged geographic market that included only properties owned by the city, with no justification for such an artificially constructed and limited market.  *Id.*  Therefore, the pleading was deficient on its face.  *Id.*  The Complaint here is distinguishable.  Thus, to the extent it is required to state a claim, CaptureRx adequately pleads a geographic market for RCP.

### 3.     CaptureRx alleges CVS's market power in the RCP market.

The Court must consider whether CaptureRx plausibly alleges that CVS has sufficient market power in the geographic market for RCP services.  It has.

*Market Power By Market Share*

One way to demonstrate market power is "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case."  *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000).  Under the market share approach, courts in the Fifth Circuit have acknowledged "30% as a rough benchmark for the minimum amount of market power necessary to give rise to a *per se* violation of antitrust law."  *Breaux Bros.*, 21 F.3d at 87 (citations omitted); *Bodet v. Charter Comms., Inc.*, Case No. 09-3068, 2010 U.S. Dist. LEXIS 87088 (E.D. La. 2010).

Defendants argue that the Complaint alleges that CVS has market share of only 23.6% in the national retail pharmacy market, Mot. at 12–13 (citing Compl. ¶ 60). However, as Defendants concede, the national market is not the relevant geographic market from which to assess market power for RCPs, nor is it what CaptureRx alleges.

Rather, using the 30% market share threshold for *per se* tying cases to allege market power, the Complaint clearly identifies 31 CBSAs where CVS has over 30% of the RCP locations, and 34 CBSAs where CVS has over 30% of RCP contracts. Compl. ¶¶ 132–33. CaptureRx also alleges that the available data likely understates the actual percentages, because CVS recently changed its one-to-one policy which restricted access to each of its retail pharmacy locations to a single CE. Compl. ¶ 134. Defendants do not contest that CaptureRx demonstrates market power in these locations. Moreover, even if they did, the Court in the concurrent *Sentry II* litigation brought by another 340B Administrator recently denied Defendants' motion to dismiss and held that allegations of market power based on allegations of 30% or greater market share in specific CBSAs are sufficient to state a valid tying claim. *Sentry II* at *13–14. CaptureRx's allegations are sufficient to state a tying claim in these 31 or 34 relevant markets.

<u>*Market Power Based On Unique Economic Circumstances*</u>

In addition to market share, "[a] plaintiff can establish that a defendant has market power based on . . . the unique economic circumstances of the market" or by showing that the defendant provides a unique service not offered by competitors. *Jefferson Parish*, 466 U.S. at 17. Here, CVS has market power because the unique economic circumstances make CVS a "must have" RCP in every CBSA in which CVS operates retail pharmacies that contract with CEs. Defendants argue that if CVS really were a "must have" retail pharmacy, then it would have more than 30% market share in more than 3% of the CBSAs. Mot. at 13–14. Defendants miss

13

the point entirely.  Due to the unique economic circumstances here, the Complaint makes clear that what establishes market power is not simply CVS's share of locations or contracts in any one CBSA.  Rather, as set forth below, CVS's unique brand recognition, prescription volume, locations relative to each CE, and other factors make CVS indispensable to any CE participating in the 340B Program, for which there is no substitute.[5]

Unlike the cases relied on by Defendants, due to the 340B Program's prohibition on steering, there is no potential for substitution in the market for RCP services.  *See* Mot. at 6 ("Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor." (quoting *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016)).  Here, a rational consumer (a CE) cannot turn around and buy a product from another provider. A CE that does not contract with CVS forgoes substantial savings under the 340B Program because the CE will recover no savings for any EP who fills a prescription at a CVS location.  Thus, because a CE may not steer EPs to specific pharmacies, it must anticipate at which pharmacies its EPs will fill their prescriptions.  Compl. ¶¶ 32, 35.

Because of CVS's brand recognition, loyalty programs, prescription volume, national footprint, massive national databases of prescription information, and wide range of products and services, its pharmacies attract a sufficient percentage of a CE's EPs, wherever it does business, such that it is a desirable contracting partner for CE's.  Compl. ¶ 135–38.  If a CE does not contract with CVS's RCPs, it loses all the potential revenue from any EP who fills prescriptions there.  *Id.*  This unique position creates market power.  *See Northern Pacific*, 356 U.S. at 7 (without analysis of market share, the Supreme Court held that "defendant possessed substantial

---

[5] Though Defendants claim that CaptureRx alleges a single brand market, Mot. at 14, this is untrue.  CaptureRx alleges that Defendants have significant market power in the CBSAs in which they operate to have the power to raise prices and reduce competition, which is all that is required to state a claim.

economic power by virtue of its extensive landholdings which it used as leverage to induce large number of purchasers and lessees to give it preference, to the exclusion of its competitors, in carrying goods or produce from the land transferred to them").

### C.   CAPTURERX SUFFICIENTLY ALLEGES A RELEVANT PRODUCT AND GEOGRAPHIC MARKET, IN WHICH CVS HAS MARKET POWER, IN THE MARKET FOR SCP SERVICES.

#### 1.   CaptureRx sufficiently alleges relevant SCP product market.

A relevant product "market is composed of products that have reasonable interchangeability," in the eyes of consumers. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  The analysis focuses on "industry or public recognition" of products, and the "peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, at 325.

Defendants challenge CaptureRx's definition of the SCP product market by taking a single sentence of the definition out of context and arguing disingenuously that the Complaint gives them no method by which to identify an SCP.  Mot. at 14–15.  CaptureRx alleges the following definition:

> Specialty Contract Pharmacies offer a wide range of contract pharmacy services that focus on the dispensing of specialty drugs. Specialty drugs are low-volume and high-cost drugs for patients undergoing intensive therapies for illnesses that are generally chronic, complex and potentially life-threatening, such as cancer, rheumatoid arthritis and Hepatitis C. Specialty drugs typically have special storage, temperature and handling requirements, are given by infusion, injection or taken orally, need to be taken on a strict schedule and cost more than regular drugs and often require close monitoring or support.

Compl. ¶ 47.  This definition is further explained by the other allegations in the Complaint, including the fact that there are separate contracts for SCPs (Compl. ¶ 48), CVS and Wellpartner market SCPs and RCPs as different products (Compl. ¶ 48), and that CVS has its own web

domain dedicated to its separate specialty pharmacy (Compl. ¶ 66). "Specialty pharmacy" is a widely recognized industry term, and is sufficiently clear to serve as a product market.

Defendants also object that in-house pharmacies are not included in the SCP definition, but incorrectly suggest that CaptureRx failed to allege a basis for this exclusion. A market is defined by what customers treat as substitutes. *Du Pont*, 351 U.S. at 393. *See also Brown Shoe*, 370 U.S. at 326; *Federal Trade Comm'n v. Staples, Inc.,* 190 F.Supp.3d 100, 127 (D.D.C. 2016). The Complaint clearly alleges that CEs do not treat their in-house pharmacies as reasonably interchangeable with regional and national specialty pharmacies, such as CVS. Compl. ¶ 108. Because only a select few specialty pharmacies offer a full range of specialty drugs, CEs must contract with those pharmacies that can serve their patients' needs. Compl. ¶¶ 66–67, 122. Most CEs lack product access and payer contracts to develop their own specialty drug program, and therefore must rely on SCPs. Compl. ¶ 48. That is to say, under the economic realities, in-house specialty pharmacies are not a substitute for SCPs, and thus should not be included.

> ## 2.    CaptureRx sufficiently alleges a relevant geographic market for SCPs.

As the Supreme Court explained in *Brown Shoe*, "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both correspond to the commercial realities of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." 370 U.S. at 336–37 (citations and quotations omitted).

Based on the economic realities in the SCP market, the relevant geographic market is national. (Compl. ¶ 122. ). The Complaint states that CEs actually consider SCPs across the United States. *Id.* It also provided specific examples of a CE in Maryland contracting with SCPs

in at least seven states, and that as of July 2018, "the typical CVS Specialty location had agreements with 214 CEs located around the country." *Id.*

Defendants argue that the GAO Report which CaptureRx cited in its Complaint suggests that about half of CEs have all of their Contract Pharmacies within 30 miles of their location. Mot. at 15; *see* GAO Report at 23 (https://www.gao.gov/assets/700/692697.pdf).  This is of course, a matter of factual inquiry that cannot be affirmatively decided on a motion to dismiss. However, even if the Court were to entertain the argument, even a small number of CEs considering contracting on a nationwide basis would be sufficient to state a claim.  *Nat'l Ath. Trainers' Ass'n v. Am. Physical Therapy Ass'n*, Case No. 3:08-cv-158, 2008 U.S. Dist. LEXIS 70131 at *39 (N.D. Tex. Sept. 9, 2008) ("If it is only a handful of patients that seek the services . . . on a nationwide scale -- a question to be addressed as the record is developed -- that would support a nationwide relevant geographic market.")  The GAO Report confirms that many CEs in fact do so here.  For example, it shows that 45% of disproportionate share hospitals had an agreement with a Contract Pharmacy that was at least 1,000 miles away.  *Id.*  Moreover, because the GAO Report excludes from its calculations mail order pharmacies, *id.*, the report likely understates the propensity of CEs to select distant SCPs.  Thus, this Court should not grant the motion to dismiss on the basis of geographic market definition.

### 3.    CaptureRx sufficiently alleges CVS's market power in the SCP market.

CaptureRx pleads facts sufficient to show that CVS's share of the SCP market exceeds the 30 % threshold for *per se* treatment under *Jefferson Parish*.  According to data gathered by the U.S. government and published in Health Resources and Services Administration ("HRSA") data, CVS's national share of SCP locations is 33.33%, and its national share of SCP contracts is 47.17%.  Compl. ¶ 137.  CVS's share of the prescription revenues, based on the volume of

17

specialty drugs sold through the 340B program, is 60%—well over the 30% threshold for market power.  Compl. ¶ 68.  Thus, CVS's large market share establishes its market power.

Defendants, however, attempt to insert their own facts in place of the ones pleaded by CaptureRx.  Specifically, Defendants cherry pick a report which suggests that CVS has only a 25% share of the specialty pharmacy market.  Mot. at 15–16.  Defendants argue that their market share must fall below the *Jefferson Parish* threshold of 30% and thus there can be no market power.  Of course, Defendants' argument is inappropriate at this stage because Defendants ask the Court to ignore the data from HRSA (the federal agency responsible for administering the 340B Program) showing CVS has 33.33% of specialty locations, 47.17% of SCP contracts (*i.e.*, number of contracts with CEs), and CaptureRx's estimate on information and belief that CVS has approximately 60% overall market share by dollar volume in the SCP market.  Compl. ¶¶ 23, 68, 137.  The Court simply cannot ignore the well pleaded factual allegations that, if accepted as true, would indicate that CVS has market power.

Defendants protest further regarding CaptureRx's estimate that CVS has approximately 60% overall market share by dollar volume in the SCP market.  Defendants take issue with the "upon information and belief" language to suggest that this figure is not credible.  Defendants rely on *Hernandez v. ARC Trading Co.*, Case No. 3:17-CV-2057-BN, 2018 U.S. Dist. LEXIS 73480 at *13–14 (N.D. Tex. May 1, 2018).  *Hernandez* was a fraud case subject to the heightened pleading standard of Rule 9(b), which requires that a party alleging fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b).  CaptureRx's tying claim is governed by Rule 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Thus, *Hernandez* is inapplicable here. Moreover, Defendants' argument is not dispositive because the HRSA data alone are sufficient

to state a claim for market power.  It is a factual issue whether the 60% overall market share by dollar volume is correct, but it is far from unimaginable in light of the 47.17% market share in terms of 340B Plan contracts.

### D.   CAPTURERX SUFFICIENTLY PLEADS INJURY.

Defendants argue that CaptureRx fails to allege that it competes in the relevant markets, and therefore, "Plaintiff cannot show injury-in-fact or antitrust injury in either market it alleges." Mot. at 17.  As to the antitrust injury requirement, Defendants offer no explanation to guide the Court as to the basis of this argument beyond a bare recitation of the antitrust injury requirement. Mot. at 17.  Nonetheless, this is clearly the type of injury "the antitrust laws were intended to prevent and that [the injury] flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Defendants incorrectly conflate injury-in-fact with antitrust injury.  *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) ("the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing").  As that court explained, losses by an excluded, would-be competitor are "easily within the conceptual bounds of antitrust injury." *Id.*  CaptureRx clearly alleges antitrust injury.

Confusingly, Defendants suggest that CaptureRx fails to allege injury-in-fact with regard to the RCP market because CaptureRx makes no allegations that it lost customers to CVS as a result of the tie in the 31 or 34 CBSAs which were specifically listed as having 30% or greater market share.  Defendants misstate both the relevant market and CaptureRx's burden at the pleading stage.  There is no requirement that CaptureRx identify particular customers it has lost due to CVS's unlawful tie.  In fact, the court in *Sentry II* held that the plaintiff could sustain its tying claim against CVS because the plaintiff had "potential customers in all of the identified CBSAs." 2019 U.S. Dist. LEXIS 57279 at *13–14.  The court did not require allegations of lost

customers in each CBSA. *Id.* Moreover, Defendants' argument ignores the allegations of the Complaint that CaptureRx competes all over the country: "CaptureRx, Sentry, Wellpartner and other 340B Administrators currently compete for the business of CEs all over the United States. Because 340B Administrators work primarily with electronic data and execute electronic transactions, they do not need to be located close to their CE customers." Compl. ¶ 123. Every CE nationwide is a potential customer for CaptureRx, and thus every customer that CVS has locked-in with this tying arrangement has caused injury-in-fact to CaptureRx.

In the market for SCP services, CaptureRx has alleged that CVS has market power in the national market and CaptureRx competes nationally. Compl. ¶¶ 68, 123, 137. Thus, the alleged loss of potential customers due to the unlawful tying arrangement represents an allegation that CaptureRx has suffered an injury. [6]

In conclusion, CaptureRx respectfully requests that this Court deny Defendants' Motion.

---

[6] Defendants may cite to an order issued *today* in yet another antitrust case challenging Defendants' tying practices. As the court in *Sentry* did with the *original* complaint, the court in this sister case, *RX Strategies, Inc. v. CVS Pharmacy, Inc., et al.*, dismissed—*without prejudice*—the tying claim against CVS Pharmacy and Wellpartner. Order, Case No. 8:18-cv-1087, ECF No. 82 (M.D. Fla. May 29, 2019). While upholding the complaint's local geographic market definition, *id.* at 5, the court found that the complaint failed to sufficiently allege market power in those *local* markets because all of the allegations focused on CVS's *national* retail market share. *Id.* at 8–10. *RX Strategies* does not support dismissal here. CaptureRx has alleged different product and geographic markets for the tying products and provided detailed allegations of CVS's market power within the local RCP markets alleged. *RX Strategies* also did not address allegations, of the type made by CaptureRx here, regarding the SCP market or direct evidence of anticompetitive effects in the tied product market.

DATED: May 29, 2019                          Respectfully submitted,


DYKEMA GOSSETT PLLC
112 East Pecan Street, Suite 1800
San Antonio, TX 78205
(210) 554-5500 - Telephone
(210) 226-8395 – Telecopier

*/s/ Ryan J. Sullivan*
C. David Kinder
State Bar No. 11432550
William (Butch) Hulse
State Bar No. 24010118
Ryan J. Sullivan
State Bar No. 24102548
whulse@dykema.com
dkinder@dykema.com
sullivan@dykema.com

*/s/ Howard B. Iwrey*
(Admitted pro hac vice)
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48305
(248) 203-0526 – Telephone
(855) 232-1791 – Telecopier
hiwrey@dykema.com

***Counsel for Plaintiff***

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was electronically filed with the Court and electronically served on the date reflected in the ECF system upon all parties registered to receive notice pursuant to the Court's CM/ECF system.

*/s/ Ryan J. Sullivan*